# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SAMVIT RAMADURGAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0057-PAF |
| | ) | |
| DESTINY XYZ INC., SOHAIL | ) | |
| PRASAD, ARCHIT KUMAR, and | ) | |
| CARLOS LICONA, | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: January 22, 2026
Date Decided: July 23, 2026

S. Michael Sirkin, R. Garrett Rice, ROSS, ARONSTAM & MORITZ LLP, Wilmington, Delaware; Christopher D. Belelieu, H. Chase Weidner, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Attorneys for Plaintiff Samvit Ramadurgam*

Andrew S. Dupre, Brian R. Lemon, AKERMAN LLP, Wilmington, Delaware; *Attorneys for Defendants Destiny XYZ Inc., Sohail Prasad, Archit Kumar, and Carlos Licona*

**FIORAVANTI, Vice Chancellor**

Two founders of a Delaware corporation built a business designed to provide public market access to private technology companies. One co-founder held control. The other held a substantial minority equity interest and served as a director. Their relationship deteriorated after the controller sought additional equity and the minority stockholder, whose approval was required, proposed governance protections, such as adding independent directors.

The controller decided to cash out his co-founder through a clandestine scheme. Unbeknownst to the co-founder, the controller hired a law firm that commissioned a valuation of the company and then, with that valuation in hand, appointed two friends to the board and rammed through a reverse-forward stock split at a special meeting at which the controller and his devoted loyalists did not even attempt to justify their faithless conduct.

The plaintiff has brought this action, asserting claims for breach of the duty of loyalty against the controller and the two new directors for approving the cash-out, and a claim for violation of 8 *Del. C.* § 155 against the company for failing to pay fair value for the cashed-out fractional interests.

There is no dispute that the fiduciary duty claims are subject to the entire fairness standard of review, requiring the defendants to prove fair process and fair price. The controller concedes that he, with advice of counsel, did not care about the process. Instead, he and the two directors he recruited to approve the transaction

have embarked on a high-stakes trial strategy. They concede that the process was not fair, but they contend that there is no liability because the price paid for fractional interests in the reverse stock split was entirely fair.

This post-trial decision concludes that the defendants failed to carry their burden of proving entire fairness. Neither the process nor the price was fair. The transaction was initiated, timed, structured, and approved under the control of the fiduciary who benefited from it. The newly appointed directors who approved the transaction made no inquiry and merely rubber-stamped it at the behest of the controller. The valuation evidence on which the defendants relied does not prove that the consideration paid fell within a range of fairness. The conflicted controller breached his duty of loyalty, and the other two directors who approved the transaction breached their fiduciary duties by consciously disregarding their responsibilities and acting in bad faith.

To remedy these breaches, the plaintiff seeks a restitutionary remedy that returns the plaintiff and the controller to their respective proportionate equity positions prior to the defendants' disloyal conduct. The court, in the exercise of its broad equitable powers to fashion appropriate relief, agrees that a restitutionary remedy is appropriate. In addition, the court finds that the individual defendants' egregious pre-litigation conduct warrants fee-shifting under the bad faith exception to the American Rule.

## I.  BACKGROUND

These are the facts as the court finds them after trial.[1]

### A.  The Parties and the Destiny Entities

Destiny XYZ Inc. ("Destiny" or the "Company"), originally known as Manifest Destiny Inc., during the events giving rise to this action, was a Delaware corporation with its principal place of business in Austin, Texas.[2]  Destiny is an

---

[1] Other factual findings are contained in the analysis of the claims.  Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit. Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the name or surname of the speaker.  Citations to JX 280, the recording of the special meeting held on November 9, 2023, are in the form of "Special Meeting # (X)," and citations to JX 281, the transcript of the special meeting held on November 9, 2023, are in the form "Special Meeting Tr. # (X)," with "X" representing the surname of the speaker. Citations to the transcript of post-trial oral argument (Dkt. 102) are in the form of "Post-Trial Arg."  Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.  When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence.  *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("The relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record.  In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] PTO ¶ 14.  Destiny had three classes of common stock:  Class A Common Stock, Class B Common Stock, and Class C Common Stock.  JX 17 § 4.1.1; JX 57 § 4.1.1; JX 363 § 3. The classes had the same economic rights, but different voting powers.  *See* JX 17 § 4.1.2–3; JX 57 § 4.1.2–3.  Class A and Class B shares carried one vote per share.  JX 17 § 4.1.3.1; JX 57 § 4.1.3.1.  Class C shares carried 20 votes per share.  JX 17 § 4.1.3.1; JX 57 § 4.1.3.1. Class B and Class C shares were convertible into Class A shares at the holder's option.  JX 17 § 4.1.4; JX 57 § 4.1.4.  As of September 30, 2023, Destiny had 15,470,544 shares

investment management company that offers the public access to private markets through the creation of exchange-traded portfolios and products.[3] Effective December 8, 2025, Destiny converted into a Delaware limited liability company.[4] Unless otherwise noted, this decision refers to Destiny as a corporation.

Samvit Ramadurgam ("Plaintiff") and Defendant Sohail Prasad are co-founders of the Company, Destiny Advisors LLC ("Advisors"), and Destiny Tech100 Inc. ("Tech100").[5] Initially, Ramadurgam and Prasad were co-Chief Executive Officers ("CEO"), co-Presidents, and co-Chairmen of the Company's board of directors (the "Board").[6] Prasad is currently the Company's CEO, Chairman, and controller.[7]

Archit Kumar and Carlos Licona (together with Prasad, the "Individual Defendants," and together with Prasad and Destiny, the "Defendants") were

---

outstanding: 5,880,544 Class A shares, 6,850,000 Class B shares, and 2,740,000 Class C shares. JX 225 Tab "Summary." On a fully diluted basis, Class A represented 39.7% of the shares and 9.29% of the voting power; Class B represented 43.07% of the shares and 10.08% of the voting power; and Class C represented 17.23% of the shares and 80.63% of the voting power. *See* JX 225.

[3] *See* JX 317 at 1.

[4] *See* Dkt. 92; Defs.' Answering Br. 38.

[5] PTO ¶ 13.

[6] *Id.* ¶ 29.

[7] *Id.* ¶ 17.

appointed to the Board on November 6, 2023, just three days before voting to approve the reverse-forward stock split.[8]

Tech100, a Maryland corporation, is a publicly traded closed-end management investment company registered under the Investment Company Act of 1940 and holds investments in venture-backed private technology companies.[9]

Advisors is a limited liability company wholly owned by Destiny.[10] Advisors provides investment advisory services to Tech100. Destiny is Advisors' Managing Member.[11]

## B. The Co-Founders' Early Days

Ramadurgam and Prasad met in 2012 when they were teenagers participating in a startup incubator program called Y Combinator.[12] They became close friends

---

[8] *Id.* ¶¶ 18−19.

[9] JX 307 ("Prospectus") at 1, 5, 13, 17–21, 78; JX 374 ¶ 24; JX 310 at 4.

[10] Prospectus at 5.

[11] PTO ¶ 15.

[12] *See* Tr. 4:16–5:3, 5:16–20, 6:5–11 (Ramadurgam); Prasad Dep. 54:11–15.

and later business partners.[13]  Their first venture together focused on private-company secondary markets.[14]

Ramadurgam and Prasad saw that equity in successful private technology companies was difficult to access and difficult to trade.[15]  Employees and early investors often held illiquid positions.[16]  Meanwhile, outside investors wanted exposure to pre-IPO companies but lacked an efficient way to obtain it.[17]  That market gap inspired Ramadurgam, Prasad, and two others to form Equidate Inc. in 2014, which later became Forge Global, Inc. ("Forge").[18]  Forge built infrastructure products for private technology companies and operated a trading platform through which institutional and accredited investors could buy and sell shares of private

---

[13] Tr. 7:11–13 (Ramadurgam); *id.* at 495:6–10 (Prasad).

[14] *Id.* at 6:16–24 (Ramadurgam).  Prasad had begun angel investing and had reached the point where he was interested in investing in later-stage companies.  He soon realized that the process was not easy.  Months would pass from the time he first tried to make the investment to the moment he could finally purchase the stock.  Prasad also saw complexity related to the involvement of legal professionals.  *Id.* at 453:23–455:5 (Prasad).

[15] *Id.* at 7:1–3 (Ramadurgam); *id.* at 455:6–9, 455:20–456:6 (Prasad).

[16] *See id.* at 455:10–19 (Prasad).

[17] *Id.* at 7:3–5 (Ramadurgam); *id.* at 456:16–457:8 (Prasad).

[18] PTO ¶ 13; Tr. 6:16–7:10 (Ramadurgam).

companies, and specifically late-stage private companies valued at over a billion dollars, known as unicorns.[19]

### C. Destiny

While at Forge, Ramadurgam and Prasad considered creating a new asset-management division. The idea was to satisfy retail investors' demand for Forge-managed funds that would invest in pre-IPO assets, providing diversified exposure without requiring investors to select individual companies or entry prices.[20] But Forge remained focused on institutional investors, making the asset-management opportunity unsuited for Forge's business.[21]

Ramadurgam and Prasad left Forge and co-founded Destiny in 2019.[22] Ramadurgam had prepared a creative brief describing the new company's goals, mission, and target audience. The brief referred to technology as a source of innovation that begins in the private company ecosystem and stated that "the future

---

[19] Tr. 5:8–10 (Ramadurgam). *See* Robert P. Bartlett, *A Founders' Guide to Unicorn Creation: How Liquidation Preferences in M&A Transactions Affect Start-Up Valuation*, *in* Research Handbook on Mergers and Acquisitions 123, 123 (Claire A. Hill & Steven Davidoff Solomon, eds., 2016). Forge completed an initial public offering ("IPO") in a $2 billion SPAC deal on March 22, 2022. Tr. 5:10–11 (Ramadurgam). Forge trades on the New York Stock Exchange ("NYSE") under the ticker "FRGE." PTO ¶ 13.

[20] Tr. 7:14–20, 7:24–8:8, 11:9–24 (Ramadurgam).

[21] *Id.* at 8:7–17, 11:3–8.

[22] *Id.* at 5:12–13.

belongs to those who are choosing to manifest their dreams into reality."[23]  That exercise led Ramadurgam to the name "Destiny XYZ Inc."[24]  Destiny was incorporated on November 1, 2019.[25]  At Destiny's founding, Ramadurgam and Prasad held equal shares of the Company, and each held the titles of co-CEO and co-President.[26]  Ramadurgam also served as Treasurer.[27]  The co-founders agreed to a five-member board, with each of them holding the title of co-Chairman; the other three seats were vacant.[28]

At the beginning of 2020, Destiny prepared an investment memorandum for its seed round.  The memorandum stated that "[a]nalogous to BlackRock in the public markets, Destiny provides investors access to the private tech industry through a family of publicly listed, liquid, ETFs."[29]  It explained that Destiny sought

---

[23] *Id.* at 9:18–10:1, 10:3–10.  From the beginning, the idea was to form publicly traded vehicles that would offer investors liquidity and diversified access to otherwise illiquid and inaccessible assets, "enabling everyone to own their own piece of the future."  *Id.* at 12:17–13:11; JX 34 at 4.

[24] Tr. 9:14–17, 10:1–2, 10:11–20 (Ramadurgam); *id.* at 481:15–16 (Prasad).

[25] PTO ¶ 14.

[26] *Id.* ¶ 29.

[27] Tr. 20:4–9 (Ramadurgam).

[28] *Id.* at 193:21–194:1.

[29] JX 18 at 4.  Destiny's thesis is to leverage public market infrastructure to provide access to private-company assets, capitalizing on the premium that public investors are willing to pay.  Tr. 104:6–15 (Ramadurgam); *id.* at 608:10–13 (Prasad).

to create a family of ETFs with thematic motifs.[30] In 2020, Destiny raised approximately $5 million in Simple Agreements for Future Equity ("SAFEs") with a $25 million valuation cap.[31] The SAFEs provided startup capital to Destiny and gave holders the potential upside of an equity interest.

Destiny's business thesis depends, in part, on public investors' willingness to pay a premium over net asset value ("NAV") for access to private company assets. By raising capital while trading at a premium to NAV, Destiny can acquire pre-IPO assets at lower prices and grow the business.[32] Long-term, the business model contemplated growth through the formation of additional funds, the accumulation of additional assets in each fund, and the appreciation of fund assets.[33] Prasad believed

---

[30] JX 18 at 7 (listing, among others, ETFs with a focus on healthcare, fintech, artificial intelligence, Latin America, and India); Tr. 13:12–14, 14:1–12 (Ramadurgam). Destiny's mission also carried a broader social goal to "break the pervasive class divisions and inequality that prevent those who are not Silicon Valley titans from participating in the growth and success of the private tech companies that are shaping our collective future." JX 317 at 1–2.

[31] JX 19.

[32] JX 37 at 7; Tr. 102:20–103:12, 104:6–105:21 (Ramadurgam); *id.* at 608:14–17 (Prasad); *see id.* at 607:6–608:7 (elaborating on the different components of the strategy). The assumption was always that Destiny's fund would trade at a premium to NAV. Tr. 100:21–104:5 (Ramadurgam); *see also* JX 35; JX 499; Tr. 612:4–615:3 (Prasad) (describing JX 499 as a "napkin" model shared with investors, which did not contemplate the possibility that Destiny's tech fund could trade at a discount to NAV).

[33] Tr. 13:12–20 (Ramadurgam).

that "Destiny has the opportunity to build a massively valuable business over time."[34]

In the second half of 2020, however, the founders' views about Destiny's direction diverged.[35] The disagreement prompted a broader discussion about the co-founders' respective roles at Destiny.[36] Ramadurgam made clear that he would not leave Destiny, but he was willing to reduce his day-to-day responsibilities.[37] The result was an October 14, 2020, governance and capital reorganization. Prasad became Destiny's sole CEO and President, and his equity stake increased to approximately 63.5%.[38] Ramadurgam retained approximately 36.5% of Destiny's equity and remained a director and co-Chairman.[39]

The reorganization occurred as Destiny prepared to launch its first fund product, Tech100. Tech100 was incorporated in Maryland on November 18, 2020.[40] Prasad and Ramadurgam were the first directors on Tech100's board.[41] Tech100

---

[34] *Id.* at 694:6–10 (Prasad).

[35] *Id.* at 20:10–22:13 (Ramadurgam).

[36] JX 21; JX 24; Tr. 494:20–23, 497:13–16 (Prasad).

[37] Tr. 24:2–17, 24:20–25:7 (Ramadurgam); JX 21 at 1 ("In no situation I can think of, am I open to 'leaving' [D]estiny."); Tr. 497:8–12 (Prasad).

[38] PTO ¶ 30; JX 28 at 1; JX 48 at 10–12.

[39] PTO ¶ 30; JX 28 at 1. In 2020, Prasad believed Destiny would be worth approximately $10 billion, and that Ramadurgam would be entitled to $3.3 billion. *See* JX 24 at 2; Tr. 589:19–590:7 (Prasad).

[40] Prospectus at 17.

[41] JX 394 at 2.

was created to hold investments in the top 100 venture-backed, late-stage, private, technology unicorns.[42] Destiny manages Tech100 through Advisors, which provides investment advisory services to Tech100 under an investment advisory and management agreement.[43]

In early 2021, as Destiny began raising capital for Tech100, Prasad and Ramadurgam agreed that Ramadurgam would enter into an employment agreement with Destiny. The arrangement was documented in a June 6, 2021, engagement agreement ("Engagement Agreement").[44] Under the Engagement Agreement, Ramadurgam became a strategic adviser focused on one to two monthly initiatives aligned with Destiny's strategic priorities, fundraising, and managing relationships with unicorn companies.[45]

The Destiny reorganization also included governance protections for future equity issuances to Prasad and his affiliates.[46] In June 2021, the Board (Prasad and Ramadurgam) approved via written consent a resolution requiring that "future offers to purchase shares by any director of the Board or his affiliates . . . be approved by

---

[42] Tr. 14:13–17 (Ramadurgam); *id.* at 472:16–473:23, 479:18–23 (Prasad); *see also* JX 312.

[43] PTO ¶ 15; JX 109.

[44] JX 46.

[45] *Id.*; Tr. 22:21–23:11, 31:11–34:16 (Ramadurgam); *id.* at 496:17–18, 497:15–17 (Prasad).

[46] JX 28 at 2.

the affirmative vote of a majority of the directors who are disinterested in such matter, even though the disinterested directors may constitute less than a quorum."[47] The same written consent approved the new equity grant to Prasad.[48]

With significant efforts from both co-founders, Tech100 raised approximately $94 million through SAFEs from approximately 200 investors during 2021 and early 2022.[49] Destiny deployed that capital under the oversight of its investment committee, which selected the investments.[50] Tech100's portfolio consists of 23 technology companies.[51] Destiny recognized its first quarterly revenues in 2021.

---

[47] JX 50 at 7.

[48] *Id.* at 13.

[49] JX 150; JX 164; Tr. 123:7–10 (Ramadurgam); *id.* at 504:6–12, 594:20–595:1 (Prasad); *see id.* at 36:10–37:21 (Ramadurgam) (explaining his substantial involvement in the fundraise and claiming responsibility for half of the amount raised); *see, e.g.*, JX 65; JX 69; JX 182; JX 128; JX 148; *see also* Tr. 505:9–24 (Prasad) (describing their fundraising process as involving going to everyone they knew).

[50] Tr. 37:22–38:15 (Ramadurgam). The investment committee met once or twice per week to review potential investments. The review began with the universe of private "unicorn" companies and used successive filters to identify suitable portfolio companies. Those filters included whether the company was U.S.-based or backed by top U.S. institutional investors, had a high-growth asset-light business model or revolutionary technology, was a market leader with significant room to scale, operating in a growing market, and benefited from network effects or economies of scale. After narrowing the list, the committee evaluated whether the companies were available at attractive prices. Tech100 would not invest in an otherwise suitable company if the price was too high. *Id.* at 38:16–43:4.

[51] JX 173 at 3–4, 15; *see* Tr. 19:22–20:1 (Ramadurgam); *id.* at 506:21–508:21 (Prasad) (describing the capital deployment process and indicating that 50% of Tech100's investment was in Space Exploration Technologies Corp. or "SpaceX").

Those revenues were generated primarily through management fees paid to Advisors for Tech100, as well as from the sale of portions of its Tech100 shares.[52]

The fundamental premise of Destiny's business model—*i.e.*, that Tech100 would trade at a premium to NAV—is reflected in illustrative valuation models that the founders shared with prospective investors and employees.[53]  A February 2021 model prepared by Prasad included a "Public Market Premium/Discount" line item set at 50%, reflecting the assumption that public accessibility could cause Tech100's shares to trade above the value of its underlying assets.[54]  In September 2021, in connection with the recruitment of a trader, Prasad shared another model that he had previously discussed with Ramadurgam.[55]  The model used a default "Revenue Multiple" of 30x, which Ramadurgam described as "very reasonable" for companies with "quality recurring revenue businesses" and "consistent with [] what [they] w[ere] seeing in the market."[56]

---

[52] PTO ¶ 15; JX 230 at 1; Tr. 90:10–15 (Ramadurgam); *id.* at 619:15–620:7 (Prasad).

[53] JX 35; JX 37; JX 53; JX 54.

[54] JX 37 at 1, 7; Tr. 102:20–103:12 (Ramadurgam).  The default assumptions were intended to "strike a balance of conservatism while [also] representing some of the incredible success private companies have experienced over the last few years."  Tr. 101:9–102:17 (Ramadurgam).

[55] JX 53; JX 54; Tr. 94:6–95:23 (Ramadurgam).

[56] JX 54 Tab "FY21 Destiny Valuation Model" Cell C6; Tr. 95:24–96:9, 97:4–5, 97:13–15, 100:13–14 (Ramadurgam).

### D. Tech100's Public Listing Process Begins.

Following the successful capital raise, the founders focused on taking Tech100 public. At the same time, however, Ramadurgam was looking to reduce his operational responsibilities. On April 28, 2022, Ramadurgam resigned from the Tech100 board, leaving Prasad as its sole director.[57] On May 12, 2022, Destiny filed a registration statement with the Securities and Exchange Commission ("SEC") to list Tech100 on the NYSE.[58] Afterward, Ramadurgam suspended his external-facing activities to comply with the quiet period under the securities laws and focused on internal strategy.[59]

One of Destiny's marketing strategies involved a "share giveaway program"—giving investors one or two pre-IPO shares of portfolio companies free of charge.[60] Ramadurgam and Prasad had used a similar strategy at Forge by giving investors pre-IPO shares in electric car maker Tesla, Inc. The Tech100 giveaway program contemplated giving away up to 700,000 Tech100 shares, in allotments of one or two shares per investor.[61]

---

[57] JX 394 at 2.

[58] *See* JX 110.

[59] Tr. 43:18–45:6 (Ramadurgam).

[60] *Id.* at 45:7–47:16; *see id.* at 533:11–24 (Prasad).

[61] *Id.* at 335:6–23 (Kumar); *see id.* at 727:10–24 (Prasad).

14

### E. Equity and Compensation Discussions

In December 2022, Prasad presented Ramadurgam with what Prasad characterized as a standard package of refresher equity grants and bonuses.[62] The package included employee grants. It also included a grant to Prasad of 3,000,000 additional shares, representing approximately 20% of Destiny's then-outstanding shares. Prasad believed the grant was warranted because of his efforts in growing Destiny's investor base.[63] Ramadurgam, whose approval was necessary, was surprised by the size of Prasad's proposed grant and told Prasad that he was willing to approve only the refresher grants for employees.[64] But Prasad was unwilling to separate the employee grants and bonuses from the proposed grant to himself.[65] The discussions stalled because the two co-founders were unable to reach an agreement, and no grants or bonuses were approved at that time.[66]

Ramadurgam and Prasad continued to discuss the issue over the ensuing months.[67] In March 2023, Ramadurgam and Prasad met at a café inside their Austin

---

[62] JX 154; Tr. 47:22–48:21 (Ramadurgam); *id.* at 517:17–518:19 (Prasad).

[63] Tr. 518:20–519:2 (Prasad).

[64] JX 158 at 2; Tr. 48:10–49:9, 49:18–50:12, 50:19–51:18, 52:4–9 (Ramadurgam); *id.* at 596:10–16 (Prasad); *see* JX 50 at 7 (requiring that future offers to purchase shares by any director or his affiliates be approved by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constituted less than a quorum).

[65] Tr. 51:19–52:3 (Ramadurgam).

[66] *Id.* at 51:19–52:3; JX 184 at 2.

[67] Tr. 520:11–24 (Prasad).

apartment building.[68]  Ramadurgam presented a proposal to grant Prasad additional equity while protecting Ramadurgam against further dilution.[69]  Ramadurgam was also concerned that investors could view Prasad's resulting equity grant as unreasonable or unwarranted.[70]  To address those concerns, Ramadurgam proposed to entrust future equity-grant decisions to an independent body.[71]  He also suggested involving an executive coach and mediator who had helped the co-founders during the 2021 governance restructuring.[72]  Prasad did not agree to that proposal.[73]

The dispute escalated in April 2023.  During an argument at the café in Austin, Ramadurgam told Prasad that litigation was a possibility.[74]  Prasad viewed that statement as a threat.  By May 2023, Ramadurgam had engaged corporate counsel.[75] He also continued proposing governance procedures for founder compensation.[76] One proposal contemplated director qualification requirements concerning

---

[68] *Id.* at 52:9–11, 53:7–14 (Ramadurgam).

[69] JX 176 at 3; Tr. 54:12–22 (Ramadurgam).

[70] Tr. 597:15–20 (Prasad).

[71] JX 183 at 2; Tr. 55:3–56:4 (Ramadurgam).

[72] JX 183 at 2; Tr. 56:15–57:22 (Ramadurgam).

[73] JX 183 at 2; Tr. 52:11–17, 57:12–16 (Ramadurgam).

[74] Tr. 523:22–524:4 (Prasad).

[75] *See* JX 184 at 2.

[76] *Id.*; Tr. 58:10–60:4 (Ramadurgam).

independence and industry expertise, along with tying the founders' ability to elect directors to their relative share ownership.[77]

## F. Prasad Plans to Oust Ramadurgam.

Ramadurgam made several attempts to communicate with Prasad about the proposal, but Prasad never responded.[78] Instead, Prasad decided to oust Ramadurgam. In August 2023, Prasad engaged lawyers in the Delaware office of McCarter & English LLP ("McCarter") to devise and quarterback "Project Activation."[79] A primary objective of the project was to squeeze out Ramadurgam before Tech100 went public.[80] At that time, the cap table included twelve minority holders other than Ramadurgam. Those holders consisted of a consultant, three investors, four advisers, and four employees.[81] Together, they held common stock amounting to about 11% of Destiny's equity on a fully diluted basis.[82]

McCarter devised a reverse-forward stock split as the most efficient and effective means of eliminating Ramadurgam and leaving Prasad as the Company's

---

[77] JX 187; Tr. 63:2–9 (Ramadurgam); *see also id.* at 61:7–63:9 (Prasad).

[78] Tr. 63:10–20 (Ramadurgam); *id.* at 598:4–6 (Prasad).

[79] PTO ¶ 31; JX 219 at 1–2; JX 233 at 1; Tr. 598:10–18 (Prasad); *see* JX 433 Log Entry No. 1. The primary lawyer on the engagement also represented Defendants at trial.

[80] *See* Post-Trial Arg. at 37:21–38:1, 46:6–10.

[81] *See* JX 225 Tab "Ownership."

[82] *Id.*

17

sole stockholder.[83]  The plan would entail the adoption of amendments to Destiny's certificate under 8 *Del. C.* § 242 and the cash-out of fractional interests under 8 *Del. C.* § 155.  Prasad and McCarter structured the scheme to keep Ramadurgam in the dark at all times.  The first step was to establish a cash-out price for the fractional interests.  To maintain stealth, McCarter—not the Company—engaged Houlihan Capital Advisors, LLC ("HCA") on September 8, 2023, to provide a valuation opinion "as to the fair market value of the equity of Destiny" on a "going concern" basis.[84]  The engagement letter stated that the valuation would be used to advise *Prasad* on "potential transaction structures and to determine the valuation of the Company in connection with said transactions."[85]  It also stated that Prasad could disclose the valuation opinion to Destiny's Board for its consideration.  The engagement letter made clear, however, that the valuation opinion was "not intended to be, and will not constitute, a fairness opinion" and that "[a]ny other use [wa]s

---

[83] Dkt. 59 at 24:17–20; Tr. 666:17–21, 694:20–23 (Prasad).

[84] JX 237 at 1; *see* PTO ¶ 32.  HCA is not to be confused with the global investment bank Houlihan Lokey, Inc.  Tr. 71:2–7 (Ramadurgam); *see also* Post-Trial Arg. at 6:21–22.

[85] JX 237 at 1.

unauthorized and may be misleading."[86]  It further provided that, before finalizing its work, HCA would "confirm facts with Prasad."[87]

After HCA began its work, Prasad and Philip Amoa from McCarter's Philadelphia office met several times with Theodore Frecka and Richard Bernard from HCA.[88]  The valuation process depended heavily on information supplied by Prasad.  HCA did not conduct an independent examination of Destiny's business or verify the information it received.  Prasad and Amoa supplied key inputs for the valuation.  They discussed deducting the full SAFE purchase amount from Destiny's equity value.[89]  They assumed that all 700,000 shares set aside for the Tech100 share giveaway would be distributed, without providing the full context of the giveaway's promotional intent.[90]  Prasad provided HCA with a written commentary regarding Destiny's prospects, risks, projected expenses, and the expected timing of Tech100's registration process.[91]  The commentary presented a more muted picture of Destiny's prospects than the one Prasad and Ramadurgam had previously shared with investors

---

[86] *Id.*

[87] *Id.*

[88] JX 241; JX 242; JX 248; JX 250; *see* Frecka Dep. 90:8–21, 101:13–22, 126:2–129:16 (referring to a conversation concerning the treatment of the SAFEs and the share giveaway program).

[89] Frecka Dep. 128:23–129:16.

[90] JX 239; JX 248; JX 249.

[91] JX 239; Tr. 602:2–10 (Prasad).

and recruits. It described limited growth, no meaningful NAV premium, no near-term ability to raise capital, and no new funds, all of which led to a depressed valuation.[92]

As it became likely that the SEC would grant effectiveness to the Tech100's registration statement on December 9, Prasad and the McCarter attorneys began pressuring HCA to complete its valuation quickly.[93] McCarter steered HCA toward the most favorable outcome for its client. When HCA proposed sending draft schedules with the preliminary indications of value on October 5, Amoa sought to minimize the paper trail, suggesting that they should first "review on a Zoom [call]."[94] After the call, Amoa asked HCA to "provide [the] draft report" with the "scenario chart, but [] limit scenario to current valuation."[95] On October 13, Frecka wrote that, "given the stakes," an HCA managing director would look at it "with a critical eye."[96] HCA sent the draft valuation report to Prasad and Amoa on October 16.[97]

---

[92] *See* JX 239; *see also* Post-Trial Arg. at 7:8–22.

[93] JX 247 at 1; Tr. 656:21–657:7 (Prasad); *see also* JX 251 at 4.

[94] JX 248 at 1–2.

[95] JX 253 at 1.

[96] *Id.*

[97] JX 254 at 1.

By early November, Prasad had moved to the next step—adding henchmen to the Board. Prasad contacted five individuals; three were not interested.[98] Given the pressing timeline, Prasad resorted to two backups, Kumar and Licona.[99] Kumar and Prasad had been friends since their first year together in college, and Prasad served as a groomsman at Kumar's wedding.[100] Licona, who operates businesses in the wellness industry and is also an insurance broker, met Prasad in Austin in 2020.[101] Kumar and Licona understood that Prasad's ultimate goal was to oust Ramadurgam from Destiny, to "clean[] up the cap table and remove that de[ad] equity from the absentee and noncontributing co-founder."[102] Prasad previewed his plan with Kumar in New York on November 2.[103] Kumar worried about his potential liability for what Prasad was asking him to do, but Prasad reassured him by directing Kumar to the indemnification provision in Destiny's certificate of incorporation.[104]

---

[98] Tr. 553:11–13, 641:9–642:13 (Prasad).

[99] JX 263 at 1; JX 264 at 2; JX 259 at 2; Tr. 644:1–4, 646:4–11, 646:14–16, 646:21–647:11, 648:1–3 (Prasad).

[100] Tr. 29:16–30:2 (Ramadurgam); *id.* at 300:6–301:18, 342:11–14 (Kumar).

[101] *Id.* at 30:11–16 (Ramadurgam); *id.* at 207:10–18, 208:5–17, 247:1–4 (Licona). *See id.* at 204:1–6.

[102] *Id.* at 331:17–19 (Kumar); *see also id.* at 266:19–22 (Licona); *id.* at 358:3–8, 418:17–20 (Kumar). In startup practice, the phrase "dead equity" refers to equity held by a founder, employee, investor, or other participant who no longer contributes value to the company. *See* Alan S. Gutterman, *Business Transactions Solutions* § 59:111 (2026).

[103] Tr. 305:2–5, 356:2–358:17 (Kumar); Kumar Dep. 60:19–61:1.

[104] JX 262 at 2; Tr. 307:12–308:18, 359:3–5, 360:9–23 (Kumar).

Similarly, Prasad reached out to Licona, who accepted the offer knowing that his first task as a director would be to adopt resolutions wiping out Ramadurgam's equity so that Prasad could "get over" the "director strife" between him and Ramadurgam.[105] Licona had never accepted an offer to join a board before because of time constraints, but he accepted Prasad's offer to become a director of Destiny because Prasad "is one of the smartest guys" he knows and thought "it would be beneficial just to have a relationship."[106]

Once Kumar and Licona were committed to the scheme, Prasad moved to the next phase of the plot. On Monday, November 6, Prasad executed a stockholder written consent electing Kumar and Licona to the Board.[107] Lest there be any doubt that the fix was in, Kumar acknowledged his appointment in an email to Prasad stating: "Let's gooo. 9:30 Thursday, looking forward to it."[108] The next day, November 7, Prasad gave notice of a special meeting of the Board to be held virtually at 9:30 a.m. Eastern Time on Thursday, November 9 (the "Special Meeting").[109] To maintain secrecy, Prasad's email to Ramadurgam, attaching the notice of the

---

[105] Tr. 212:18–24 (Licona).

[106] *Id.* at 206:22–207:7, 207:19–24.

[107] PTO ¶ 34; JX 267.

[108] JX 265 at 2; Tr. 362:24–363:15 (Kumar).

[109] PTO ¶ 35; JX 269; JX 270; JX 275 at 2; Tr. 63:23–64:14, 64:19–65:4 (Ramadurgam); *id.* at 652:10–12 (Prasad).

meeting, did not copy or reference Licona or Kumar. Neither the notice nor the email included a proposed agenda or any mention of the items to be discussed. Later that afternoon, Prasad's counsel arranged to have the certificate amendments effecting the reverse and forward stock splits to be filed with the Delaware Secretary of State's office "immediately following receiving approval" at Thursday's Special Meeting.[110]

Upon receiving notice of the special board meeting, Ramadurgam became suspicious. Destiny had never held a formal Board meeting.[111] Prasad had stopped communicating with Ramadurgam during the prior month, and the notice did not disclose the purpose of the meeting.[112] Ramadurgam asked Prasad what the meeting would cover and whether he and Prasad remained the only Board members.[113] Prasad did not answer.[114]

On November 8, HCA sent its final report (the "HCA Report") to Prasad and McCarter.[115] That same day, McCarter reiterated the need to proceed with

---

[110] JX 274 at 2.

[111] Tr. 64:15–17 (Ramadurgam).

[112] *Id.* at 65:5–15, 66:17–67:1; *id.* at 364:16–20 (Kumar); Kumar Dep. 105:17–106:1; *see* JX 275 at 1.

[113] JX 275 at 1–2; Tr. 64:19–65:4, 65:16–66:16 (Ramadurgam); *id.* at 652:13–22 (Prasad).

[114] Tr. 63:10–20, 66:17–67:1 (Ramadurgam); *id.* at 652:13–653:1, 653:15–18 (Prasad).

[115] PTO ¶ 33; JX 273 (the "HCA Report").

immediate filing of the certificate amendments with the Delaware Secretary of State after the Special Meeting.[116]

## G. The Special Meeting

At 9:00 a.m. on November 9, 2023, Prasad sent a notice to Ramadurgam and other stockholders announcing that he had elected Licona and Kumar to the Destiny Board.[117] Thirty minutes later, Prasad convened the virtual Special Meeting by Zoom, with cameras off.[118] In attendance were directors Prasad, Ramadurgam, Kumar, and Licona, along with Ethan Silver, Destiny's Chief Operating Officer and in-house counsel, serving as the corporate secretary.[119] No one from HCA attended. At the outset, Prasad, seeking to avoid accountability, announced that recording of the meeting was prohibited.[120] Nevertheless, Ramadurgam surreptitiously recorded the Special Meeting.[121]

During the Special Meeting, Ramadurgam addressed Kumar and Licona directly. He asked Kumar and Licona what they knew about the Company and to explain their relationship with Prasad.[122] Licona described his background in

---

[116] JX 274 at 1.

[117] PTO ¶ 36; JX 278.

[118] PTO ¶ 37.

[119] *Id.*; Tr. 511:6 (Prasad).

[120] Special Meeting Tr. 1:17–18 (Prasad).

[121] JX 280; Tr. 68:21–69:12, 189:2–5 (Ramadurgam). The audio recording is a trial exhibit.

[122] Special Meeting Tr. 8:1–5 (Ramadurgam).

insurance, retail, managing general agency work, startups, gyms, nutrition, safety, and transportation technology.[123] He said he had known Prasad for about four years.[124] Kumar described his experience in financial services consulting, fintech work at J.P. Morgan, a software-as-a-service company serving the public sector, and a Series B startup in the customer support space.[125] Kumar acknowledged that he had known Prasad "since college."[126]

### 1. The HCA Report

The meeting was scripted, literally.[127] Prasad began the meeting with a "discussion of the corporation's current valuation and fair value."[128] He stated that he had engaged HCA to assist him in determining the fair value of the Company's equity.[129] Prasad then shared the 69-page HCA Report in the Zoom chat.[130] Until

---

[123] *Id.* at 8:9–16 (Licona).

[124] *Id.* at 8:14.

[125] *Id.* at 8:23–9:5 (Kumar).

[126] *Id.* at 9:5–6 (Kumar).

[127] Tr. 654:7–16 (Prasad). The script had been prepared by Prasad's counsel, McCarter. *See* JX 433 Privilege Log Entry Nos. 409–13, 433–37, 463–67, 535–38, 542, 545, 548, 550–55, 561–63, 572–76, 583, 591–93, 627–29, 635–48 (emails among counsel and Prasad dated October through November 2023 and preceding the Special Meeting, reflecting the subject lines "Project Activation – Board Minutes and Script," "Activation – Draft Script for Review," "Script – Slightly Updated," "Updated Script & Documents for Board Meeting").

[128] Special Meeting Tr. 2:18–19 (Prasad).

[129] *Id.* at 2:19–21; Tr. 655:8–11 (Prasad); *id.* at 70:12–17, 71:2–6 (Ramadurgam).

[130] Special Meeting Tr. 2:21–22 (Prasad).

that moment, Kumar, Licona, and Ramadurgam had never seen the HCA Report nor any version of it.[131]

Prasad gave the attendees no more than 15 minutes—an average of 13 seconds per page—to review the HCA Report, which Prasad called a "comprehensive document."[132] After approximately ten minutes, Prasad stated that there were a few pages that he wanted to call out.[133] After 15 minutes, Prasad recited that HCA had determined that the "fair value" of a Class A share and a Class B share was $0.14 per share, and a Class C share was $0.15.[134] He lied. Nowhere did the HCA report state that it was determining the "fair value" of Destiny or its shares. HCA stated that it was determining "fair market value," and Frecka admitted that the distinction was "important."[135]

Prasad explained that the anticipated public listing of Tech100 would have positive effects, but emphasized that the Company's revenue was expected to be approximately 30% lower after the listing because of a less lucrative fee structure.[136] Prasad then opened the floor for discussion.[137] After having only a few minutes to

---

[131] *See* Tr. 656:1–4 (Prasad); *id.* at 381:17–19 (Kumar).

[132] Special Meeting Tr. 2:24–3:1 (Prasad); Tr. 322:18–22 (Kumar); *id.* at 656:5–7 (Prasad).

[133] Special Meeting Tr. 3:8–14 (Prasad); Tr. 656:8–20 (Prasad).

[134] Special Meeting Tr. 3:19–24 (Prasad).

[135] Frecka Dep. 222:12.

[136] Special Meeting Tr. 4:1–2, 4:7–9 (Prasad).

[137] *See id.* 5:5–8.

26

review the HCA Report, Ramadurgam asked a series of questions about HCA's assumptions, to which Prasad responded.[138]  Kumar and Licona, on the other hand, asked no questions.[139]

Prasad then pasted a resolution "to adopt the fair value prices" in the chat and asked the directors to vote using the "chat function" on Zoom.[140]  Ramadurgam politely and calmly protested that he had not been given an agenda for the meeting and registered his concern about not having been supplied sufficient information.[141] But Prasad was entirely dismissive as reflected in the transcript of the Special Meeting.

> Ramadurgam:  I'm saying that for me to take a legal action, without knowing the context of the meeting and if there'll be any other repercussions of this which I'm not aware of, would make it irresponsible for me to say, yes, since I have not been adequately informed as to why we're taking this action, what the plan is subsequently in the meeting.  And so, I don't feel informed, and I feel I was given last-minute notice just 30 minutes before this meeting of the Board consent to add two new directors.  It's been – I don't feel like I've had the information to make educated decisions as a Board member, and my questions to you, Sohail, over the last few days have not been responded to.  And so, I just want to state for the record that I don't have the information to vote on this.

---

[138] *Id.* at 5:10–12, 5:19–6:2, 6:18–24 (Ramadurgam).

[139] *Id.* at 9:7–9 (Prasad).

[140] *Id.* at 9:11–16.

[141] *Id.* at 9:17–19, 9:22–10:8 (Ramadurgam); Special Meeting at 31:18:00–31:29:00 (Ramadurgam); *see* Tr. 661:3–21 (Prasad) ("Q.  So even during the meeting, you didn't want to give [Ramadurgam] the agenda for the meeting.  Isn't that right.  A.  Yes.").

Prasad: So noted for the record. And having received three assenting votes out of the four directors eligible to vote, these resolutions are hereby adopted. . . . [142]

### 2.    The Transaction

Prasad next turned to Destiny's capital structure.[143] He stated that the Company's objective was to "properly incentivize its employees" and to ensure that those participating in the Company's upside continued to invest in the Company.[144] He also referred to the Company's ability to attract talent, financing, and investment.[145] Prasad stated that Destiny's capital structure did not "optimally serve those purposes."[146] This was corporate-speak for "Ramadurgam has to go."

Prasad proposed that the Board approve a reverse-forward stock split (the "Transaction") through amendments to Destiny's certificate of incorporation.[147] The first certificate amendment would effect a reverse stock split at a ratio of 1,850,000 to one. Any resulting fractional interests would be paid out in cash based upon the HCA valuation that the Board had just approved. The forward split amendment would then effect a forward stock split at a ratio of one to 1,850,000. When

---

[142] Special Meeting Tr. 9:22–10:8 (Ramadurgam); *id.* at 10:9–11 (Prasad); Tr. 375:4–9, 375:20–23 (Kumar); *id.* at 661:3–662:3 (Prasad).

[143] Tr. 663:9–13 (Prasad).

[144] Special Meeting Tr. 10:11–15 (Prasad).

[145] *Id.* at 10:15–17; Tr. 663:14–664:1 (Prasad)

[146] Special Meeting Tr. 10:17–18 (Prasad).

[147] *Id.* at 10:18–21.

Ramadurgam asked what Destiny's capitalization would look like after the Transaction, Prasad brushed him off, responding that he could not "speak to any individual's personal holdings or equity ownership."[148] In fact, the effect would be that Ramadurgam and the 11 common equity holders would be cashed out, with Prasad being the sole remaining stockholder. But the real target was Ramadurgam, because Prasad had always intended to make the other stockholders whole through new equity grants.

Ramadurgam asked Kumar and Licona whether they understood the legal liability they could face. Prasad interrupted and instructed him to "keep any questions, comments, or discussions specific to the resolution and the matter at hand."[149] Kumar and Licona did not respond to Ramadurgam's question and stayed silent during the discussion about the Transaction.[150] Ramadurgam protested that, "as a significant shareholder," he found this action "egregiously inappropriate and unfair."[151] Prasad dismissively replied that the comment was "noted for the record."[152] Kumar and Licona did not even voice their approvals during the meeting.

---

[148] *Id.* at 13:16–22.

[149] *Id.* at 16:12–17:2 (Prasad); Tr. 276:10–277:6 (Licona).

[150] Tr. 79:20–24 (Ramadurgam); *id.* at 223:13–15, 227:19–21 (Licona).

[151] Special Meeting Tr. 17:14–16 (Ramadurgam); Tr. 280:16–23 (Licona).

[152] Special Meeting at 49:45:00–49:46:00.

Instead, Prasad recorded that he, Kumar, and Licona had voted in favor of the resolution through the chat function on Zoom.[153]

### 3. The termination of the Engagement Agreement

The third agenda item was the termination of Ramadurgam's Engagement Agreement.[154] Prasad stated that Ramadurgam served as an at-will employee and had made no material contributions to the Company except for a three-month period from January to April 2021 during Tech100's first private fundraise. Prasad recited that, over the prior 18 months, Ramadurgam had been absent from day-to-day operations apart from occasionally joining team meetings, making one-off introductions, or reviewing an associate's work, which Prasad estimated amounted to less than five hours a month. Prasad also stated that Ramadurgam reportedly spent more than 60 days at silent meditation retreats during the prior year. Prasad recommended terminating the strategic-adviser relationship as being in the long-term best interests of the Company.[155] Ramadurgam objected, observing that his proposed termination seemed to be in retaliation for having questioned Prasad's large equity grant to himself.[156] Kumar and Licona remained mute and joined Prasad

---

[153] Special Meeting Tr. 18:1–2 (Prasad); Tr. 228:2–3, 280:24–281:20 (Licona).

[154] Tr. 376:23–377:4 (Kumar).

[155] Special Meeting Tr. 18:5–16 (Prasad).

[156] *Id.* at 18:19–19:2 (Ramadurgam).

in voting to terminate Ramadurgam through the Zoom chat function.[157] Similarly, Silver remained silent throughout the entire meeting.

The Board actions were implemented immediately. Within minutes of the conclusion of the Board meeting, Prasad's personal counsel, McCarter, arranged for the certificate amendments effecting the reverse and forward stock splits to be filed with the Delaware Secretary of State.[158] The combined effect was to cash out Destiny's minority stockholders and leave Prasad as the only stockholder holding shares after the forward split.[159] The Company paid the cashed-out stockholders, including Prasad, for their fractional interests.[160] The Transaction caused confusion among at least one Destiny employee. At 5:07 p.m., an employee texted Prasad: "Heya not really understanding the email on reverse split. What's going on here/what does it mean for my shares?"[161]

## H. The Aftermath

Immediately after the Special Meeting, Ramadurgam asked Prasad to provide written documentation of the resolutions and actions taken during the meeting, as

---

[157] *Id.* at 19:9–10; Tr. 231:2–5 (Licona).

[158] PTO ¶ 39; JX 287 (certificate amendment effecting reverse stock split filed at 10:31 a.m.); JX 288 (certificate amendment effecting forward stock split filed at 10:32 a.m.).

[159] Tr. 668:4–9 (Prasad).

[160] PTO ¶ 44; Tr. 667:21–668:3 (Prasad).

[161] JX 279 at 2.

well as a record of the discussion. But Prasad did not produce any document until months later.

On December 22, 2023, just six weeks after Prasad cashed out his co-founder, the SEC declared Tech100's registration statement effective.[162] Before filing suit, Ramadurgam offered to engage in mediation and reconciliation. Prasad was unmoved and responded:

> The transactions are complete and final, and the relevant former fractional shares are cancelled. There is no possible claim that would provide you any continued equity position. Given that, candidly I'm not moved by any threat of litigation. It's incredibly unlikely that any claim you make would provide a greater monetary value than was already provided. In fact, not only would I/we successfully prevail, the cost of pursuing an extended, public litigation would certainly exceed any potential monetary objectives you may have.[163]

Destiny sent Ramadurgam and Pacific Premier Trust Custodian FBO Samvit Ramadurgam IRA (the "Trust") a total of $710,000 for his fractional interests.[164] Ramadurgam returned the portion of the funds that had been sent to him personally. The portion sent to the Trust has remained there since then.[165] Ramadurgam did not

---

[162] PTO ¶ 24.

[163] JX 292.

[164] *See* JX 303; Tr. 85:7–13 (Ramadurgam). Despite claiming that the $710,000 paid to Ramadurgam in the reverse stock split was fair value, the Defendants were eager to tell the court that they were willing to settle the case by paying Ramadurgam $10.2 million. *See* Dkt. 61 at 2; Defs.' Opening Br. 1; Post-Trial Arg. at 79:5–10.

[165] Tr. 85:14–22, 189:11–190:16 (Ramadurgam).

use those funds and treated them as escrow after receiving counsel's advice against accepting the cash-out consideration.[166]

Ramadurgam filed this action in January 2024. Only after Ramadurgam filed the present action and served discovery requests did Prasad produce the minutes of the Special Meeting (the "Minutes") and Board resolutions in February 2024.[167] Prasad, with McCarter's assistance, drafted the Minutes.[168] Neither Kumar nor Licona approved them.[169]

The Minutes omit and falsely represent portions of the Special Meeting.[170] They do not include the questions and comments that Ramadurgam made during the Special Meeting, even though Prasad repeatedly responded that many of Ramadurgam's comments were simply "noted for the record."[171] Instead, the Minutes indicate that the participants engaged in "robust discussion[s]" and that the

---

[166] *Id.* at 190:17–191:2.

[167] JX 348 (the "Minutes").

[168] Tr. 662:10–15 (Prasad). Prasad testified that he drafted the Minutes himself. *Id.*; *but see* JX 433 Privilege Log Entries Nos. 710, 727, 732, 735–37, 739, 742, 752, 754, 760–61, 763 (November and December 2023 emails among counsel and Prasad reflecting the subject lines "Updated Draft Board Minutes," "Project Activation – Reconciling Board Meeting Script and Minutes," and "Project Activation – Final Board Minutes").

[169] Tr. 282:16–20 (Licona); *id.* at 441:16–18 (Kumar).

[170] *Compare* Special Meeting Tr., *with* Minutes.

[171] *Compare* Special Meeting Tr. 10:9, 17:14–20, *with* Minutes; *see* Tr. 661:3–662:9, 670:20–671:2 (Prasad); *id.* at 283:2–7 (Licona). Those omissions did not concern Licona. Tr. 282:21–283:1 (Licona).

"Board carefully deliberated" before approving the resolutions.[172]    That representation is belied by the transcript of the meeting.

After the SEC declared Tech100's registration statement effective, Destiny moved forward with the share giveaway program.[173]  On March 18, 2024, out of the 700,000 maximum shares contemplated by the program, Destiny gave away 23,211 shares of Tech100.[174]  On March 25, 2024, Destiny filed three different amendments to its certificate of incorporation.[175]  Those amendments authorized additional shares and effected a forward split and a share reclassification.[176]

On March 26, 2024, Tech100 began trading on the NYSE under the ticker "DXYZ."[177]  Afterward, Advisors's management fees increased.  Before Tech100's public listing, Advisors earned 2% of Tech100's invested capital per year.  After the listing, Advisors earned 2.5% of Tech100's average gross assets at the end of the two most recently completed calendar quarters, payable quarterly.[178]  From the date Tech100 began trading until the date of the trial, Tech100 never traded at a discount

---

[172] Minutes at 1–3; Tr. 662:16–19, 673:15–17 (Prasad).

[173] *See* JX 239 at 2.

[174] JX 376 at 1; Madsen Report ¶ 115.

[175] JX 363; JX 364; JX 365.

[176] Tr. 697:17–698:17 (Prasad); JX 363; JX 364 at 2–3; JX 365 at 2–3.

[177] PTO ¶ 16.

[178] *Id.* ¶ 15; Prospectus at 5.

to NAV.[179]  In fact, from the listing through March 31, 2025, Tech100 averaged a premium to NAV of more than 400%.[180]

On April 2, 2024, Destiny granted new stock options to a number of employees whose equity had been eliminated in the Transaction.[181]  Those grants restored equity participation of some of the other cashed-out stockholders.[182]  During the same month, Destiny sold some of its Tech100 shares for approximately $9 million.[183]  A few weeks later, Tech100 filed a follow-on registration statement, authorizing a $1 billion capital raise upon effectiveness.[184]  After trial, on July 15, 2025, the SEC granted effectiveness to a follow-on registration statement.[185]  On

---

[179] Tr. 707:21–708:2 (Prasad); Madsen Report ¶ 95.

[180] Madsen Report ¶ 93.

[181] *See* JX 367; JX 368; JX 369; JX 371.  Destiny also granted stock options to a new employee.  *See* JX 370.

[182] *Compare* JX 225 Tab "Ownership" Cell 9L (reflecting that Silver held 4.31% of Destiny's equity on a fully diluted basis prior to the Transaction), *with* JX 367 (indicating that Silver was granted 7.5% after the Transaction).  *Compare* JX 225 Tab "Ownership" Cell 21L (reflecting that Vincent Higgins held 1.72% of Destiny's equity on a fully diluted basis prior to the Transaction), *with* JX 368 (indicating that Higgins was granted 5.25% after the Transaction).  *Compare* JX 225 Tab "Ownership" Cell 28L (reflecting that Robert Blecher held 0.54% of Destiny's equity on a fully diluted basis prior to the Transaction), *with* JX 369 (indicating that Blecher was granted 2% after the Transaction).  *Compare* JX 225 Tab "Ownership" Cell 8L (reflecting that Christine Healey held 3.28% of Destiny's equity on a fully diluted basis prior to the Transaction), *with* JX 371 (indicating that Healey was granted 4% after the Transaction).

[183] JX 376; JX 384.

[184] JX 386 at 3.

[185] Destiny Tech100 Inc., Form N-2 Notice of Effectiveness (July 15, 2025).

August 8, 2025, Tech100 filed a prospectus supplement disclosing that it had entered into an agreement with Jefferies LLC to offer and sell up to $1 billion of common stock.[186]

Since the Special Meeting, the Board has held a meeting every six months.[187] Prasad currently owns 98% of Destiny's equity on an undiluted basis and approximately 69% on a diluted basis.[188] Before Destiny's conversion to a limited liability company, Prasad held 20,350,000 total shares.[189]

## I. Procedural History

On January 23, 2024, Ramadurgam filed a verified complaint against Destiny, Prasad, Kumar, and Licona (the "Complaint"). The Complaint contains three counts. Count I alleges Prasad breached his fiduciary duties as a controlling stockholder. Count II alleges Prasad, Kumar, and Licona breached their fiduciary duties to Ramadurgam as directors of Destiny. Count III alleges the Company violated Section 155 of the Delaware General Corporation Law ("DGCL") by failing

---

[186] Destiny Tech100 Inc., Prospectus Supplement (Aug. 8, 2025).

[187] Tr. 233:1–3 (Licona).

[188] *Id.* at 591:15–21 (Prasad); Prasad Dep. 34:12–18.

[189] *See* Pl.'s Opening Br. 51.

to pay fair value to Ramadurgam for his fractional interests that were cashed out in the reverse stock split.

The court held a three-day trial, followed by post-trial briefing and argument.[190]

## II. ANALYSIS

### A. The Fiduciary Duty Claims

"The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002) (TABLE). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation modified).

"Directors of Delaware corporations owe two fundamental fiduciary duties to the corporation and its stockholders—the duty of care and the duty of loyalty." *GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at *28 (Del. Ch. Nov. 15, 2024) (citing *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986)). "[A] shareholder owes a

---

[190] Dkts. 79, 98–100, 102; PTO ¶ 11.

fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (citation modified) (quoting *Ivanhoe P'rs v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987)). There is no dispute that the Individual Defendants owed fiduciary duties. Prasad owed fiduciary duties as Destiny's controlling stockholder, and as a director and officer. Kumar and Licona, as directors, also owed fiduciary duties to Ramadurgam and the Company.

"When [fiduciaries] of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (citing *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 57–58 (Del. 1952)). As the Delaware Supreme Court recently reaffirmed, "a controlling stockholder is a fiduciary and must be fair to the corporation and its minority stockholders when it stands on both sides of a transaction and receives a non-ratable benefit." *In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 460 (Del. 2024). In those circumstances, "entire fairness is the presumptive standard of review." *Id.* at 451.[191]

---

[191] "[W]here the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers,

In this case, because Ramadurgam was cashed out of his shares in a reverse stock split that created fractional interests, Section 155(2) of the DGCL required Destiny to pay him in cash "the fair value of fractions of a share" as of November 9, 2023. 8 *Del. C.* § 155(2). In *Applebaum v. Avaya, Inc.*, the Delaware Supreme Court held that "fair value" in Section 155 "has a meaning independent of the definition of 'fair value' in Section 262" of the DGCL, the appraisal statute. 812 A.2d 880, 892 (Del. 2002); *see id.* at 893 (observing that "valuation guidelines for the right to receive 'fair value' under Section 155(2)" differ from those under Section 262). But the Court also indicated that "a Section 155(2) inquiry may resemble a Section 262 valuation if the controlling stockholder will benefit from presenting a suspect measure of valuation, such as an outdated trading price, or a wrongfully imposed private company discount." *Id.* at 891; *see also id.* at 893 ("when a minority stockholder is confronted with a freeze-out merger, the Section 262 appraisal process will prevent the proponents of the merger from 'reaping a windfall' by placing the full value of the company as a going concern into the merged entity while compensating the dissenting stockholder with discounted consideration.").

In the seminal post-*Applebaum* case applying this standard, this court held that "[w]hen a controlling stockholder uses a reverse split to freeze out minority

---

which are reviewed under the business judgment standard." *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

stockholders without any procedural protections, the transaction will be reviewed for entire fairness with the burden of proof on the defendant fiduciaries." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011).[192] The parties here agree that entire fairness applies.[193] Therefore, Defendants bear the burden to prove that the Transaction was entirely fair.

### 1. Whether the Transaction Was Entirely Fair

Entire fairness has "two basic aspects:  fair dealing and fair price." *Weinberger*, 457 A.2d at 711.  The inquiry is unitary.  "[T]he test for fairness is not a bifurcated one as between fair dealing and price." *Id.*  "All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*  "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test.  The converse is equally true: process can infect price." *Reis*, 28 A.3d at 467 (citing *Kahn v. Tremont Corp.,* 694 A.2d 422, 432 (Del. 1997) ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the [s]pecial

---

[192] In *Reis*, this court reasoned that when the remedy does not call for anything other than an award of fair value, it is appropriate to "conduct the same essential inquiry as in an appraisal, albeit with more leeway to consider fairness as a range and to consider the remedial objectives of equity." 28 A.3d at 468 (citation modified).  As explained below, the remedy in this case calls for something other than a purely monetary award.

[193] Pl.'s Opening Br. 33; Defs.' Opening Br. 1, 18, 41; Pl.'s Answering Br. 24–25; Defs.' Answering Br. 7; Post-Trial Arg. at 3:22–24; *see also id.* at 36:15–16 ("Mr. Prasad, who was the majority owner – that's why we're conceding it's an entire fairness case.  We have a majority stockholder here.").

[c]ommittee might have been fair does not save the result." (citation modified))). At the same time, the Delaware Supreme Court has held that "[a] fair process usually results in a fair price. Therefore, the proponents of an interested transaction will continue to be incentivized to put a fair dealing process in place that promotes judicial confidence in the entire fairness of the transaction price." *Ams. Min. Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012). On the other hand, the Delaware Supreme Court has held that a transaction can be entirely fair based upon a finding of fair price, even if the process was not fair. *See Emerald P'rs v. Berlin*, 840 A.2d 641 (Del. 2003) (TABLE) (affirming trial court's determination that the transaction was entirely fair despite "find[ing] that the many process flaws in th[e] case raise[d] serious questions as to the independent directors' good faith" but deferring to the trial court's determination that "the price was fair").

Defendants seek to reduce this case solely to an evaluation of the fair price prong of the entire fairness analysis. They concede that the Transaction was not the product of a fair process.[194] They essentially argue that consideration of the process prong is meaningless because Plaintiff received the substantial equivalent of what

---

[194] PTO ¶¶ 57, 90; Defs.' Opening Br. 19. Ironically, despite this admission, Licona and Kumar insisted at trial that the process was fair. *See* Tr. 239:16–18 (Licona) ("Q. We can agree the process was not fair; right? A. I disagree with that."); *id.* at 328:21–24 (Kumar) ("Q. So how could that have been fair to the stockholders and the company, Mr. Kumar? A. It was extremely fair, because this was essentially a one-to-one transaction."). This testimony not only confirms that Licona and Kumar were (and are) inattentive and uninformed, but also that they were simply doing Prasad's bidding.

he held before the Transaction.[195] Defendants' strategy relies heavily on the outcome in *In re Trados Inc. Shareholder Litigation*, 73 A.3d 17, 76 (Del. Ch. 2013).[196] In *Trados*, this court held, after trial, that the defendants had not proven fair dealing, but had proven fair price because the common stock had *no economic value* before the merger. *Id.* at 76–78. Under those circumstances, "the common stockholders received in the [m]erger the substantial equivalent in value of what they had before." *Id.* at 78.

*Trados* is inapposite. Unlike in *Trados*, Destiny's back was not against the wall, and Ramadurgam's shares in Destiny were not valueless. To the contrary, Destiny was on the precipice of taking Tech100 public, realizing the fundamental vision of the co-founders' business plan. Ramadurgam held a substantial equity interest in Destiny that Prasad chose to wipe out shortly before Tech100 began publicly trading. The court declines Defendants' invitation to write the obituary of the fair process prong of the entire fairness standard.[197] Rather, the court will apply the entire fairness standard in line with the Delaware Supreme Court's admonition to organize the analysis in accordance with the *Weinberger* factors. *See In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 702 (Del. 2023).

[195] Defs.' Opening Br. 41.

[196] Defs.' Opening Br. 41–42.

[197] If that obituary is to be written, it will be authored by this court's managing editors at the Delaware Supreme Court.

### a. Fair dealing

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction." *Tremont*, 694 A.2d at 430. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711.

Defendants did not prove fair dealing. Instead, the evidence overwhelmingly demonstrated that Prasad was dealing from the bottom of the deck, and Licona and Kumar were in on the hustle.

### i. Initiation and timing

The first *Weinberger* factor examines how the decision under challenge was initiated. *See Weinberger*, 457 A.2d at 711. The scope of the first *Weinberger* factor is not limited to the formal act of making the proposal; it encompasses actions taken in the period leading up to it. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 938 (Del. 1985) (applying *Weinberger* and considering evidence concerning how the controller structured the transaction before negotiations began); *Tremont*, 694 A.2d at 431 (analyzing initiation and timing as part of the fair-dealing inquiry).

Prasad initiated the Transaction for the sole purpose of wiping out his co-founder, Ramadurgam. Prasad timed the Transaction to occur when Tech100 was

"very close" to the final stages of the SEC registration process, a critical stage that would test Destiny's business thesis.[198] Prasad admits this was his objective.[199]

Defendants argue that Tech100's later trading history and later capital raising developments were not known or knowable on November 9, 2023. But that is precisely why the process in this case infects the fair price analysis. Prasad timed the transaction to eliminate Ramadurgam's equity before Tech100's public listing could provide market evidence bearing on Destiny's access-premium thesis. That timing gave Prasad the basis to argue that the value of Tech100—Destiny's primary asset—remained uncertain as of the Transaction date. Prasad's strategic timing of the Transaction before a milestone that both co-founders believed would positively affect Destiny's value evidences unfairness.

The timing of the pre-meeting steps reinforces that conclusion. On November 7, before HCA sent its final report and before the Special Meeting, a McCarter paralegal arranged for a filing service to be on standby for two priority Delaware filings immediately after the Special Meeting. That step is another strong indicator that Prasad and his attorneys knew that Kumar and Licona were passive participants in Prasad's scheme and would approve the Transaction without making

---

[198] Special Meeting Tr. 4:2–5 (Prasad).

[199] Post-Trial Arg. at 37:21–38:1, 46:6–10.

any inquiry. It also reveals the HCA Report and the Special Meeting as merely components of a predetermined transaction.

### ii. Negotiation and structure

The next *Weinberger* factor examines how the transaction was negotiated and structured. *See Weinberger*, 457 A.2d at 711.

There was no negotiation over the Transaction. Prasad leveraged his control position to eliminate Ramadurgam as retribution for his suggesting they select independent, qualified directors to consider Prasad's outsized demands for additional equity.

The structure of the Transaction likewise favored Prasad. The Transaction was a reverse-forward stock split. Prasad chose the 1,850,000-to-one reverse-split ratio because he was the only stockholder who held more than 1,850,000 shares, and he admitted that the ratio was selected because it would leave him as the sole remaining stockholder.[200] The nearly instantaneous forward split restored Prasad's remaining whole shares to his pre-split position, giving him sole ownership of Destiny's equity.

Prasad also chose the reverse-forward stock split instead of a merger to avoid the stockholder notice obligations and deprive Ramadurgam of the right to seek

---

[200] Prasad Dep. 178:3–6, 191:7–11.

appraisal of his shares.[201]  As Licona rationalized, the reverse-forward stock split was "the most feasible way" to eliminate Ramadurgam, because "his shares would become fractional, and those shares could be then cashed out."[202]

Prasad's appointment of Kumar and Licona reinforced that structure.  Prasad appointed them three days before the Special Meeting.  They were not appointed to negotiate with Prasad, test the Transaction, or inquire into the facts.

### iii.  Disclosure and approval

The final *Weinberger* factors examine disclosure and approval.  *See Weinberger*, 457 A.2d at 711–12.

The notice of the Special Meeting did not disclose the agenda, and Prasad ignored Ramadurgam's requests to disclose the meeting's purpose and whether he and Prasad remained the only directors.  Prasad did not disclose that he had appointed Kumar and Licona to the Board until 30 minutes before the meeting. Ramadurgam entered the Special Meeting unaware of Prasad's plan to eliminate Ramadurgam's equity.

---

[201] *See* 8 *Del. C.* § 251(c) (requiring, when a merger is submitted for stockholder approval at a meeting, notice of the time, place, and purpose of the meeting at least 20 days before the meeting and a copy or brief summary of the merger agreement); *id.* § 228(e) (requiring prompt notice to nonconsenting stockholders when corporate action is taken by less than unanimous written consent); *id.* § 262(d)(2) (requiring notice to stockholders when a merger is approved by written consent and providing a period to demand appraisal).

[202] Tr. 220:6–15 (Licona).

Prasad did not disclose the 69-page HCA Report until the meeting was underway. No one from HCA was invited to attend the meeting to explain the HCA Report—which had been prepared for Prasad personally, not for the Company—even though Prasad was asking directors to rely upon it. Prasad gave the attendees no more than 15 minutes to review it, and he misrepresented the document. Prasad, Kumar, and Licona then adopted the per-share values from the HCA Report essentially sight unseen, and they did so knowing that the next item of business was the reverse-forward stock split. When Ramadurgam asked what else was on the agenda, Prasad did not answer, and his henchmen sat mute. Prasad then counted the three votes in favor and announced that the valuation resolution had been approved.

When Prasad presented the reverse-forward stock split proposals, Ramadurgam asked what Destiny's capitalization would look like after the Transaction. Prasad dodged Ramadurgam's legitimate inquiry, feigning that he could not "speak to any individual's personal holdings or equity ownership."[203] This was another lie, to which Licona and Kumar were complicit.

The approval process was equally deficient. The Board's majority approved the HCA Report, the Transaction, and the termination of the Engagement Agreement without asking any questions or engaging in discussion. McCarter's pre-meeting

---

[203] Special Meeting Tr. 13:21–22 (Prasad).

arrangements with the Delaware Secretary of State to record the certificate amendments confirm that immediate board approval was never in doubt.

The overwhelming evidence exposed Kumar and Licona as faithless fiduciaries. They knew that they had been appointed to approve resolutions that would end the co-founder dispute on Prasad's terms, and they did not hesitate to oblige. Kumar expressed willingness to help Prasad "clean[] up the cap table and remove that de[ad] equity from the absentee and noncontributing co-founder."[204] Kumar and Licona approved the Transaction without making any meaningful inquiry.

Kumar's testimony illustrates the point. He believed the HCA Report was a fairness opinion, even though the first page clearly indicated that it was not.[205] He did not know which valuation methodologies HCA had used.[206] He did not review any of the documents underlying the HCA Report and assumed that HCA had received what it needed.[207] He did not know why 1,850,000 was selected as the split

---

[204] Tr. 331:17–19 (Kumar); *see also id.* at 266:19–22 (Licona); *id.* at 358:3–8, 418:17–20 (Kumar).

[205] *Id.* at 379:18–381:13, 381:17–19 (Kumar); Kumar Dep. 137:15–138:3.

[206] Tr. 404:18–406:8, 406:13–18 (Kumar).

[207] *Id.* at 381:23–382:5, 404:3–406:23, 410:6–11, 411:5–22, 416:12–417:11.

ratio.[208] He did not know what a closed-end fund was.[209] He also believed that Tech100's management fees to Destiny had nothing to do with Destiny's value.[210]

Similarly, Licona asked no questions about the Transaction and glibly testified that the HCA Report was "self-explanatory," even though he had no time to read it.[211] He did not seek or request independent financial or legal advice, asserting to the contrary that in his experience "[i]n the middle of a board meeting . . . no one has ever" considered "go[ing] [to] get independent financial advice."[212] He was not concerned that Prasad had personally retained HCA and had been the principal source of the information for HCA's valuation. In Licona's view, Prasad, "as the person in charge of the operation," "would do the right thing" in presenting information to HCA.[213] Licona knew that it was in Prasad's personal financial interest for the cash-out price to be as low as possible, but Licona did not consider that fact relevant to his role.[214] Nor did Kumar or Licona ask for Ramadurgam's side of the story before the meeting, and they chose to ignore his substantive questions at the meeting. When Ramadurgam asked whether they understood their

---

[208] *Id.* at 418:5–13.

[209] Kumar Dep. 193:2–7.

[210] *Id.* at 198:9–20.

[211] Tr. 223:13–17 (Licona).

[212] *Id.* at 244:14–21, 245:8–17, 270:4–10; Licona Dep. 165:5–10.

[213] Tr. 221:20–222:4 (Licona).

[214] *Id.* at 269:8–19.

legal responsibility and the liability they could face, Prasad interrupted and directed him to keep his comments to the resolution. When Ramadurgam stated that, "as a significant shareholder," he found the Transaction "egregiously inappropriate and unfair," no one asked a question, requested more time, or sought additional information.[215] All the while, Kumar and Licona stood mute when their fiduciary duties demanded otherwise.

Defendants emphasize that Kumar and Licona did not receive compensation to serve on the Board, had no business relationship with Prasad other than being on Destiny's board, and were not expressly instructed how to vote. This argument reflects a fundamental misunderstanding of a director's fiduciary duties. Directors are presumed to be informed, disinterested, and independent. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). But that is only a presumption. When applying the entire fairness test, the inquiry must focus on whether the directors actually discharged their duties and functioned as a meaningful check on a conflicted controller.[216]

---

[215] Special Meeting Tr. 17:14–19 (Ramadurgam); *see id.* at 17:20–23 (Prasad).

[216] *See, e.g.*, Telephonic Post-Trial Bench Ruling, *Eldridge SMT Hldgs. LLC et al. v. Hall et al.*, C.A. No. 2025-0608-PAF, at 31:1–5 (Del. Ch. Oct. 24, 2025) (TRANSCRIPT) (explaining that independence is not a "formalistic qualification," but a substantive attribute tied to the ability to exercise judgment); *id.* at 32:4–15 (discussing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), and *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,

Kumar and Licona failed miserably, and it is not a close call. The two directors willingly supplied the votes Prasad needed to approve the Transaction on short notice without being informed. In other words, the Board enabled the approval mechanism for the controller-designed cash-out. *See Reis*, 28 A.3d at 460 ("A reverse split under those circumstances is the 'functional equivalent' of a cash-out merger." (citing *Metro. Life Ins. Co. v. Aramark Corp.*, 1998 WL 34302067, at *3 (Del. Ch. Feb. 5, 1998))).

### b. Fair price

Fair price "relates to the economic and financial considerations" of the transaction, "including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711.

> The court's task is not to pick a single number, as it would for a damages calculation, but to determine whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."

*In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 520 (Del. Ch.) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch.

---

845 A.2d 1040, 1050 (Del. 2004)); *see also Aronson*, 473 A.2d at 816 (defining independence as the capacity to decide based on "the corporate merits of the subject before the board rather than extraneous considerations or influences"); *Beam*, 845 A.2d at 1050 (explaining that independence is compromised where a director's discretion would be "sterilized").

1994), *aff'd*, 663 A.2d 1156 (Del. 1995)), *modified on reargument*, 2024 WL 3555781 (Del. Ch. July 2, 2024); *see also Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003) ("The value of a corporation is not a point on a line, but a range of reasonable values . . ."), *aff'd in part, rev'd in part on other grounds,* 884 A.2d 26 (Del. 2005). Thus, the question is whether Defendants proved that the price approved in the Transaction fell within a range of fairness— one that a reasonable seller, under all the circumstances, would reasonably accept.

Defendants rely principally, and half-heartedly, on the HCA Report. They argue that HCA's contemporaneous valuation, their expert's defense of that valuation, and the evidence regarding Forge's recent acquisition of a competitor to Destiny establish that the cash-out price was fair.[217] Plaintiff responds that the HCA Report was not a fairness opinion, was prepared for use by the controller and his counsel, relied on management-supplied information, and materially understated Destiny's value.[218]

The HCA Report does not help Defendants to satisfy the fair price prong for three principal reasons. First, HCA's engagement and the source of information cannot be disentangled from the controller's conflict. Second, HCA's treatment of Tech100 and Destiny's management fee arrangement understates the core value

---

[217] Defs.' Opening Br. 19–22.

[218] Pl.'s Answering Br. 27–31.

drivers in Destiny's business model. Third, HCA's capital structure adjustments consistently moved value downward in favor of the controller. Therefore, Defendants did not carry their burden of proving fair price.

### i. The HCA Report

HCA issued the HCA Report on November 8, 2023, and used a valuation date of September 30, 2023.[219] The HCA Report was prepared for McCarter—Prasad's personal counsel—pursuant to the September 8, 2023, engagement letter.[220] The engagement letter expressly stated that the HCA's final product "[wa]s not intended to be, and will not constitute, a fairness opinion" and that "[a]ny other use [wa]s unauthorized and may be misleading."[221] HCA understood that the valuation would be used by Prasad, described as Destiny's "controlling owner," and by McCarter to advise Prasad on potential transaction structures and to determine the valuation of the Company in connection with said transactions.[222] In other words, HCA's work was not generated through a process designed to simulate arm's-length bargaining. *See M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."). HCA's client was never the Company. From

---

[219] *See* HCA Report at 2.

[220] *Id.*

[221] *Id.* at 2, 6.

[222] *Id.*

53

the beginning, the client was always Prasad, though McCarter retained HCA, and the work product from the engagement was intended to assist the controlling stockholder in formulating and executing a controller-favored transaction.

HCA purported to value Destiny on a fair-market-value basis.[223] It defined fair market value as the price at which property would change hands between a willing buyer and a willing seller, neither under compulsion, and both having reasonable knowledge of relevant facts.[224] By contrast, fair value protects the stockholder's proportionate interest in the company as a going concern. *See Ban v. Manheim*, 339 A.3d 41, 66 (Del. Ch. 2025) ("[T]he fair price inquiry generally involve[s] comparing what the stockholders received with their proportionate share of the corporation's value as a going concern."). Thus, "[t]he true 'test of fairness' is whether the minority stockholder receives at least 'the substantial equivalent in value of what he had before.'" *Id.* at 67 (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952)).

### *The source of information and the valuation methodology*

The HCA Report states that management represented that the information provided was reasonably complete and accurate, and that HCA did not

---

[223] HCA Report at 2, 4, 6–8, 40–41, 43, 48–49.

[224] *Id.* at 2, 6 (citing Internal Revenue Ruling 59-60).

independently examine that information.[225]  Here, the source of that information is particularly important.  HCA relied on information supplied by Prasad.  Ending the inquiry there would risk overlooking a key implication—that Prasad had the strongest economic incentive to support the lowest valuation possible.  He and McCarter supplied and influenced HCA's treatment of certain inputs from the outset, including the SAFEs, the Tech100 share giveaway, and Destiny's prospects and risks.[226]  The context surrounding the drafting of the HCA Report is critical in assessing the reliability of HCA's analysis.  *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at \*2 (Del. Ch. Aug. 27, 2015) (finding that management manipulated projections and created an "informational deficit," depriving the special committee and its financial adviser of reliable information necessary to negotiate and evaluate the transaction effectively).

HCA selected a market approach and used the guideline public company method.[227]  The HCA Report outlines why other valuation methods would not be

---

[225] HCA Report at 2, 51.

[226] Tr. 682:21–683:19 (Prasad) (discussing the commentary document prepared for HCA); *id.* at 756:22–757:3, 757:24–758:8 (Madsen) (testifying that certain projections and costs in the HCA Report reflected statements made by Prasad to HCA for purposes of its valuation); *see also* Post-Trial Arg. at 7:1–7 (Plaintiff arguing that HCA did not receive information reflecting a more favorable view of Destiny's prospects, including the 15(c) questionnaire, valuation models, and investor materials).

[227] HCA Report at 4, 43–50.

considered proper for valuing Destiny.[228]  But that methodological choice left the entire report exposed to any shortcomings in HCA's selection of the guideline public companies.  *See, e.g.*, *Merion Cap., L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *7 (Del. Ch. July 8, 2013) (concluding that the comparable companies analysis was unreliable because it relied on companies that were not comparable).

HCA selected 19 guideline public companies.[229]  Frecka could not explain why HCA selected the specific guideline companies it used, other than by referring to the companies' AUM and revenue.[230]  Defendants minimize that criticism, responding that the experts generally worked from a common universe of potentially comparable asset managers and that the dispute concerned valuation judgment.[231] The court agrees that selecting guideline companies involves a degree of judgment. But Defendants bore the burden of showing that HCA's judgment was reliable, and they did not develop a persuasive explanation for why the selected companies "are

---

[228] HCA rejected a discounted cash flow ("DCF") analysis because a long-term cash-flow forecast suitable for a DCF was not available, Destiny was unprofitable as of the valuation date, and management expected higher operating expenses in the future.  *Id.* at 40.  It rejected a comparable transactions method because it could not identify a sufficiently robust set of transactions involving comparable target companies with publicly available data.  *Id.*  It rejected a prior transactions method because it was not aware of recent or pending arm's-length transactions representative of fair market value.  *Id.*  It rejected an adjusted net asset method because Destiny was a going concern and was not a holding company in liquidation or expected to liquidate.  *Id.*

[229] HCA Report at 43.

[230] Tr. 778:7–17 (Madsen); Post-Trial Arg. at 16:19–23, 89:3–4.

[231] Post-Trial Arg. at 49:1–24, 63:3–64:10.

truly comparable to [Destiny]." *See Laidler v. Hesco Bastion Env't, Inc.*, 2014 WL 1877536, at *8 (Del. Ch. May 12, 2014) (indicating the same concern regarding the selection of the guideline companies).

HCA considered multiples of a variety of indicators but concluded that two metrics were most applicable: enterprise value to AUM (the "EV/AUM") and enterprise value to revenue (the "EV/Revenue").[232] The median EV/AUM multiple for the guideline companies was 1.6%, and the median EV/Revenue multiple was 2.91x.[233]

HCA selected an EV/AUM multiple of 1.60%, in line with the peer-company median, and an EV/Revenue multiple of 0.70x, substantially below the peer-company median of 2.91x.[234] HCA reasoned that lower multiples were warranted because Destiny was smaller, less diversified, less profitable, and riskier than the guideline companies.[235] HCA also relied on management's expectation that revenue would be approximately 30% lower after Tech100's IPO.[236] That assumption is challenged by other contemporaneous statements and representations that Prasad

---

[232] HCA Report at 44.

[233] *Id.*

[234] *Id.* at 47.

[235] *Id.* at 45–46.

[236] *Id.* at 45.

made.[237]  At the same time, HCA recognized that Destiny generated more revenue per dollar of AUM than the guideline companies, suggesting that the higher AUM multiple was warranted, and that peers making direct investments in private companies generally traded at higher multiples, suggesting that higher multiples "may be warranted."[238]  HCA nevertheless selected only the median EV/AUM multiple and a below-median EV/Revenue multiple.

That choice had a material effect on the valuation.  Applying those selected multiples, HCA used AUM of $56,076,786 and last-twelve-months revenue of $1,842,009.[239]  The EV/AUM method produced an indicated enterprise value of $897,229, and the EV/Revenue method produced an indicated enterprise value of $1,289,406.[240]  After deducting debt of $103,250, the two methods produced equity values, excluding cash, of $793,979 and $1,186,156.[241]  HCA weighted the two indications equally, resulting in an equity value of $990,067, excluding cash.[242]

---

[237] *See* Tr. 778:21–779:18 (Madsen) (noting that HCA focused on a 2.5% growth rate, misinterpreted quarterly growth as annual growth, and that the lower assumption was inconsistent with projections made in the ordinary course); *cf. id.* at 869:6–871:14 (Lesovitz) (defending HCA's use of lower multiples based on declining revenues and actual company performance).

[238] HCA Report at 46.

[239] *Id.* at 47.

[240] *Id.*

[241] *Id.*

[242] *Id.*

### *Capital structure and key value drivers*

Destiny's business model relies on two principal value drivers: Destiny's management fees and Destiny's ownership of Tech100 shares. HCA's treatment of Destiny's Tech100 shares moved the value downward. Destiny owned 1,455,276 Tech100 shares.[243] HCA excluded 700,000 shares that it understood would be given away upon Tech100's IPO and an additional 17,000 shares that would be sold or given away to satisfy NYSE listing requirements. As a result, HCA valued only 738,276 Tech100 shares.[244] HCA multiplied those shares by Tech100's reported Q2 2023 NAV per share of $4.974, producing an indicated value of $3,672,185.[245] HCA then applied a 15% discount to NAV, reasoning that closed-end funds typically trade at a discount to NAV and that Tech100's recent performance and broader market sentiment in the technology sector supported a higher-end discount.[246] That produced a discounted Tech100 value of $3,121,357.[247]

HCA's treatment fails to properly account for Destiny's business thesis. The anticipated giveaway was *up to* 700,000 shares, not a fixed obligation to transfer all

---

[243] *Id.* at 14, 46, 47 n.6.

[244] *Id.* at 46.

[245] *Id.* at 47 & n.6.

[246] *Id.* at 47 & n.7.

[247] *Id.* at 47.

700,000 shares for no value.[248]  Additionally, HCA did not assign any value to the giveaway's promotional purpose.[249]  That omission is at odds with the principle that "when the court determines that the company's business plan as of the merger included specific expansion plans or changes in strategy, those are corporate opportunities that must be considered part of the firm's value."  *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 315 (Del. Ch. 2006).  Moreover, HCA treated the additional 17,000 shares as if they had no value, even though shares sold for listing purposes would generate proceeds.  And the 15% NAV discount treated Tech100 as an ordinary closed-end fund expected to trade below NAV, without taking into account Destiny's core business thesis.  Closed-end funds do not mechanically trade at discounts.  Premiums and discounts vary with investor demand and sentiment, and each fund has its own characteristics.  *See* Charles M.C. Lee, Andrei Shleifer & Richard H. Thaler, *Investor Sentiment and the Closed-End Fund Puzzle*, 46 J. Fin. 75 (1991).

Tech100 never traded at a discount to NAV after listing, and Prasad acknowledged that Ramadurgam "ended up being correct" about Tech100 trading at

---

[248] *See* Prospectus at 62, 65; Post-Trial Arg. at 88:3–4.

[249] *See* Aswath Damodaran, *Valuing Companies with Intangible Assets* 35 (Sep. 2009), https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/intangibles.pdf  (explaining that brand name advertising may have valuation consequences because it can build intangible value).

a premium to NAV.[250]  Although later trading evidence does not establish the premium known or knowable on November 9, 2023, it is a useful check against HCA's assumption that Tech100 should be valued at a discount to NAV.  *See Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 362 (Del. 1997) ("[P]ost-[transaction] evidence is not necessarily inadmissible to show that plans in effect at the time of the [transaction] have borne fruition.") (citation modified).

After adding cash, management fees payable, and the discounted Tech100 investment, HCA concluded that Destiny's total equity value was $7,965,529 on a controlling, marketable basis.[251]  HCA then deducted the $5,012,955 SAFE purchase amount, reasoning that, in a liquidity event before termination of the SAFE agreements, SAFE investors could elect to receive a cash payment equal to the purchase amount or receive common stock equal to the purchase amount divided by the liquidity price, and that the purchase amount would be paid before any distribution to common stockholders.[252]  HCA treated the SAFEs as a dollar-for-

---

[250] *See* Tr. 729:14–731:7 (Prasad) (admitting that Tech100 never traded at a discount and that Ramadurgam "ended up being correct" that it would trade at a premium to NAV); *see id.* at 707:17–708:5 (acknowledging that Tech100 went public on March 26, 2024, never traded at a discount to NAV, always traded at a premium, and peaked at an 1,800% premium to NAV); *id.* at 708:11–709:6 (acknowledging Madsen's calculation of a 387% average premium excluding the first-week peak).

[251] HCA Report at 4, 47–50, 69.

[252] *Id.* at 49.

dollar debt claim, even though no interest applied to the SAFEs, they had no repayment schedule, and no fixed maturity.

The SAFEs deduction left approximately $3 million of value for the common equity.[253] That result is revealing. After valuing Destiny as a going concern and adding its Tech100 interest, the HCA Report's SAFEs deduction resulted in a common equity value that roughly tracked cash on hand, leaving minimal incremental value for Destiny's asset management business, its Tech100 thesis, or its prospects.[254] HCA divided the common equity value by 15,470,544 shares outstanding.[255] That yielded a value of $0.19 per share on a controlling, marketable basis.[256] HCA then applied a combined 28% discount to the Class A and Class B shares, consisting of a 10% discount for lack of control and a 20% discount for lack of marketability.[257] For the Class C shares, HCA applied a combined 24% discount, consisting of a 5% discount for lack of control and a 20% discount for lack of marketability.[258] HCA concluded that the fair market value of the Class A and

---

[253] *Id.* at 49, 69; Tr. 710:1–18 (Prasad) (indicating that after accounting for the SAFE waterfall, the resulting common equity value was approximately $3 million and that this was the amount of cash Destiny had on hand at the time).

[254] HCA Report at 47–50; *see also* Post-Trial Arg. at 8:1–7.

[255] HCA Report at 4, 14, 50, 69.

[256] *Id.* at 4, 50, 69.

[257] *Id.* at 50, 69.

[258] *Id.* at 50, 69.

Class B shares was $0.14 per share and that the fair market value of the Class C shares was $0.15 per share.[259] Those were the values that the Board adopted at the Special Meeting. They are also the values that Defendants rely on to prove fair price.

*Adjustments*

HCA then made additional adjustments. The HCA Report's narrative stated that, after deducting debt, HCA "applied a control premium of 20.0%" to calculate equity value on a controlling, marketable basis.[260] The valuation schedule, however, shows "Control Premium @ 0.0%" and applies no control premium adjustment.[261] At his deposition, Frecka testified that the reference to a 20% control premium was a drafting error and that HCA had "concluded that no control premium was warranted."[262] But Frecka did not testify at trial. Based on Prasad's active involvement in HCA's valuation work, the assertion that the reference to a 20.0% control premium was a typo rests on weak grounds. Prasad and Amoa explicitly

---

[259] *Id.* at 50, 69.

[260] *Id.* at 46.

[261] *Id.* at 47. Defendants acknowledged the disconnect between the Report's narrative and its schedule, characterizing it as a mistake in implementing the valuation model. *See* Tr. 858:18–22 (Lesovitz) (testifying that the control premium discussion was a text mistake that did not flow into the HCA's calculations); *see also* Post-Trial Arg. at 51:11–17. But that explanation does not cure the problem because the HCA Report was the valuation adopted for the Transaction, and it did not attempt to address the disconnect between the narrative and the schedule.

[262] Frecka Dep. 211:16–25; *id.* at 315:3–4 ("This 20% is erroneous. It should not have been in there."); *id.* at 318:16-18 ("There was a drafting error that said we applied a control premium. In fact, we did not apply a control premium.").

63

requested that Frecka not share the draft report before their Zoom meeting.[263] Following the Zoom meeting, HCA did not share the draft report for an additional ten days.[264] The court concludes that HCA's initial draft report applied a 20% control premium, but that HCA removed the premium from the valuation schedule after the Zoom meeting while leaving the corresponding narrative unchanged. The change inured to Prasad's benefit, and the HCA Report offers no explanation for it.

Applying the 20% control premium described in the narrative would have increased HCA's total equity value by approximately 2.5%, and the residual common equity value after the SAFE deduction by approximately 6.7%. HCA's narrative described a control premium analysis; Appendix I to the HCA Report included a discussion of control premiums, and the final schedule applied no upward adjustment while applying discounts for lack of control and lack of marketability.[265]

That asymmetry is significant. HCA did not increase value for control, despite describing its conclusion as controlling and marketable. It then reduced the value

---

[263] *See* JX 248 at 1–2. The version of the report that HCA discussed with Prasad and Amoa during the October 5 or 6, 2023, virtual meeting is not in the record.

[264] *See* JX 254 at 1. There are no material changes between the draft report HCA shared on October 15, 2023, and the final report HCA sent on November 8. *Compare* JX 254, *with* HCA Report.

[265] HCA Report at 46–47, 53–55; *see also* Frecka Dep. 312:12–313:25 ("Appendix I lays out some information about control premiums and discounts, so I feel it's appropriate to include [A]ppendix I regardless. The erroneous part was stating that we applied a 20% control premium. That's not factually correct.").

for lack of control and lack of marketability. HCA valued Ramadurgam's shares as if he were voluntarily selling an illiquid minority block to a third party. In a controller-driven cash-out, that approach allowed the controller to benefit from the minority's lack of control and lack of liquidity, which, in turn, enabled the cash-out. *See Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989) ("[T]o fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.").[266]

The court gives the HCA Report little to no weight. HCA's work relied exclusively on information supplied by the conflicted side of the Transaction, and its weakly supported valuation choices reduced the value available to the cashed-out stockholders. The HCA Report's most critical choices all moved in the same direction. HCA selected a revenue multiple below the median despite recognizing upside consideration, failed to apply the control premium described in its narrative,

---

[266] This was not the only error in the HCA Report that Defendants minimize as a "typo" or "drafting error." Defs.' Answering Br. 9. The HCA Report represented that management had only projected "modest AUM growth in the future (approximately 2.5% per year)." HCA Report at 44. But, in fact, Prasad's commentary projected a 2.5% quarterly growth rate. JX 239 at 1. Defendants insist this error did not "flow through" into HCA's analysis, although Plaintiff's expert disagrees. *See* Tr. 779:1–14 (Madsen). Whether this was another typo or not, it further undermines the reliability of the HCA Report and fits a broader pattern of HCA's discretionary choices consistently moving Destiny's value downward.

excluded and discounted substantial Tech100 value, deducted the SAFEs in full, and then applied minority and marketability discounts. Those choices produced a value that reflected the controller's desired transaction structure more than a reliable measure of what Ramadurgam's equity was worth. The court does not find that every methodological choice HCA made was improper. Destiny was a young company, had a limited operating history, was not profitable, and presented risks that a valuation professional could reasonably consider. But the HCA Report, as a whole and in the context of this controller cash-out, does not prove that Ramadurgam received a price within a range of fairness.

### ii.     The expert evidence

Each side's damages expert confirmed that the HCA Report's valuation did not reflect a fair price for Ramadurgam's shares. Defendants offered Joseph Lesovitz to support the HCA Report.[267] Plaintiff offered Eric Madsen, who performed his own analysis.[268] The court need not adopt either expert's opinion wholesale. The relevant question remains whether Defendants proved that the Transaction's price fell within a range of fairness.

Lesovitz's opening report provides limited independent support for Defendants' fair price position. Lesovitz did not perform his own valuation. Instead,

---

[267] JX 459 ("Lesovitz Report") at 1.

[268] JX 458 ("Madsen Report") ¶ 6.

he reviewed the HCA Report and opined that HCA's methodology and calculations were reasonable.[269]  He agreed with HCA's use of the guideline public company method, its downward adjustments to the selected multiples and metrics, its deduction of the SAFE purchase amount, and its discounts for lack of control and lack of marketability.[270]

The court finds that Lesovitz's rebuttal analysis is more helpful, but it weighs against Defendants.[271]  In rebuttal, Lesovitz criticized Madsen's valuation as "overstated, speculative, and cannot be relied upon."[272]  He then presented what he called the "Corrected Madsen Report."  That draft did not reflect a standalone valuation of Destiny.  Rather, Lesovitz accepted the general structure of Madsen's analysis for purposes of rebuttal and changed a series of inputs to reflect Defendants' criticisms of Madsen's assumptions.[273]  Lesovitz adjusted Madsen's guideline company set, lowered the selected multiples, weighted the AUM multiple more heavily than the revenue multiple, reduced the control premium and the Tech100 access premium, accounted for the 700,000-share giveaway, and deducted the SAFE

---

[269] Lesovitz Report at 6–7, 11–12.

[270] *Id.* at 7–11.

[271] JX 461 ("Lesovitz Rebuttal Report").

[272] *Id.* at 48.

[273] *Id.* at 31–32, 45–49; Tr. 871:24–874:17 (Lesovitz) (describing the "Corrected Madsen" valuation); *id.* at 922:19–923:20 (Lesovitz) (acknowledging that he did not perform his own independent "cover-to-cover" valuation).

purchase amount.[274] Even after those defense-favorable corrections, Lesovitz calculated a 100% equity value of $6,770,773 and a value of $2,128,572 for Ramadurgam's 31.44% interest.[275] That is approximately a 200% increase over HCA's valuation.[276]

The court does not treat Lesovitz's corrected Madsen analysis as the fair value of Destiny. But it is probative because it shows that even after accepting many of Defendants' criticisms of Madsen, the resulting value remained materially above the price adopted for the Transaction. For example, Lesovitz did not subscribe to HCA's decision not to apply a control premium.[277] Rather, he opined that "the most appropriate control premium is approximately 28%" as of November 9, 2023.[278] That result undermines Defendants' contention that the Transaction price was well within a range of fairness.

Madsen's valuation points in the same direction, though the court does not adopt his ultimate number.[279] Madsen used a market approach to value Destiny's

---

[274] Lesovitz Rebuttal Report at 46–47.

[275] *Id.* at 47–48.

[276] *See* Defs.' Post-Trial Demonstrative at 30.

[277] Tr. 943:19–24 (Lesovitz).

[278] Lesovitz Rebuttal Report at 7. That adjustment alone would have increased HCA's residual common-equity value after the SAFE deduction by approximately 9.4%. *See* Defs.' Post-Trial Demonstrative at 30.

[279] Madsen Report ¶ 7.

asset management business and an asset approach to value Destiny's Tech100 interest.[280] Madsen valued Destiny substantially above the cash-out price.[281] As of November 9, 2023, he concluded that a 100% equity interest in Destiny was worth $32.4 million and that Ramadurgam's 31.44% interest was worth $10.2 million.[282] He identified two principal sources of value: Destiny's management fees earned by its wholly owned subsidiary, Advisors, and Destiny's ownership of Tech100 shares.[283]

Madsen's analysis usefully identifies the value drivers that the HCA Report discounted or missed. He focused on Destiny's access premium business thesis, its Tech100 stake, the economics of the share giveaway, the absence of an actual control premium in HCA's model, and the effect of deducting the SAFEs in full. Those issues go to the core of whether HCA's price fairly captured Destiny's value.

At the same time, the court does not adopt Madsen's $32.4 million valuation for purposes of finding the fair price. Madsen's analysis required several judgment calls that resolved uncertainty in Plaintiff's favor.[284] The access premium analysis

---

[280] *Id.* ¶ 32.

[281] *Compare id.*, with HCA Report at 4.

[282] Madsen Report ¶¶ 7, 123.

[283] *Id.* ¶ 19; Tr. 735:10–20 (Madsen).

[284] Defendants' principal attack on Madsen focused on the degree to which his analysis relied on post-valuation-date information and aggressive assumptions. *See* Post-Trial Arg. at 56:16-59:23.

relied substantially on post-valuation date trading evidence.[285] His selection of 75th percentile multiples reflected a judgment that Destiny's growth prospects, smaller fund size, and direct investment in Tech100 justified a valuation above the guideline company median.[286] And his treatment of the SAFEs emphasized their practical economic characteristics and Prasad's incentives, rather than assigning full weight to the formal priority rights that could arise in a liquidity event.[287]

Those choices responded to real features of Destiny's business and capital structure. But taken together, they resolve too much uncertainty in Plaintiff's favor. The court therefore credits Madsen's analysis as additional evidence against the HCA Report, rather than adopting it as Destiny's fair value estimate.[288]

In conclusion, the expert evidence leaves Defendants short of their burden.

### iii. Defendants failed to prove a fair price.

Defendants have failed to prove fair price. Their principal evidence was the HCA Report—a flawed and one-sided valuation commissioned by counsel for the controlling stockholder, prepared from information supplied by the conflicted side of the Transaction who steered HCA's conclusions downwards. The court gives the

---

[285] Madsen Report ¶¶ 77–78, 91, 93, 97–101.

[286] *Id.* ¶¶ 71, 124–26, 136, 140, 149–150; *id.* Exs. 1.1, 2.1, 2.3.

[287] Madsen Report ¶¶ 102–114; *id.* Ex. 3.3.

[288] Defendants also pointed to Forge's later acquisition of another company as real world evidence that Madsen's valuation was too aggressive. Post-Trial Arg. at 52:17–54:18. The court declines to credit that transaction as reliable valuation evidence.

HCA Report little to no weight. Defendants supplemented the HCA Report with Lesovitz's testimony, but Lesovitz did not perform a standalone valuation, and his rebuttal exercise produced a value materially above the Transaction price. Thus, Defendants' expert evidence did not save the HCA Report either.

This case is unlike *Trados*, where the court found an unfair process but concluded that the common stock had no economic value. *See Trados*, 73 A.3d at 76–78. Ramadurgam's shares were not valueless. They represented a substantial equity interest in a going concern entity that managed Tech100 and held a meaningful stake in Tech100. Defendants did not prove that the reverse-forward split gave him the substantial equivalent in value of what he had before the Transaction.

Therefore, the fair price outcome weighs against Defendants.

### c.    Unitary determination

"Although often applied as a bifurcated or disjunctive test, the concept of entire fairness requires the court to examine all aspects of the transaction in an effort to determine whether the deal was entirely fair." *Tremont*, 694 A.2d at 432 (citing *Weinberger*, 457 A.2d at 711). "The two components of the entire fairness concept are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process." *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007). Defendants bear the burden of proving entire

fairness. "When assigned the burden of persuasion, this test obligates the directors, or their surrogates, to present evidence which demonstrates that the cumulative manner by which it discharged all of its fiduciary duties produced a fair transaction." *Tremont*, 694 A.2d at 432 (citing *Cinerama*, 663 A.2d at 1163). The court "must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness." *Ams. Min.*, 51 A.3d at 1248.

Defendants failed to prove entire fairness on both the dealing and price elements. Under the unitary entire fairness inquiry, Defendants failed to prove that the Transaction was entirely fair to Ramadurgam.[289] Prasad breached his duty of loyalty as a controlling stockholder and director. Kumar and Licona also breached their fiduciary duties, including the duty of loyalty.

The duty of loyalty is not limited to self-dealing. It "also encompasses cases where the fiduciary fails to act in good faith." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). If "directors fail to act in the face of a

---

[289] Because Destiny's certificate of incorporation contains an exculpatory provision, a finding that the Transaction was not entirely fair does not, standing alone, establish Kumar and Licona's personal liability for damages. The court must identify a non-exculpated breach as to each director. *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015) (holding that a plaintiff seeking damages must plead a non-exculpated claim against an exculpated director "regardless of the underlying standard of review," including entire fairness); *id.* at 1182 (explaining that an exculpated director may remain liable where the record supports disloyalty, lack of independence, or bad faith).

known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Id.*

Establishing bad faith requires more than showing an inadequate process or gross negligence. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 65 (Del. 2006) (explaining that "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith"). Rather, bad faith is shown where "the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Id.* at 67 (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)). As our Supreme Court cautioned in *Lyondell Chemical Co. v. Ryan*, "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." 970 A.2d 235, 243 (Del. 2009). "Only if [directors] knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty." *Id.* at 243–44. That is what happened here.

Kumar and Licona were not merely uninformed as to material information; they were willfully blind. They knew that Prasad stood on both sides of the Transaction. In fact, they testified that they understood the Transaction to be the solution to the co-founder dispute by eliminating Ramadurgam's equity. They

73

welcomed their appointment to the Board just two days before the Special Meeting, with no concern about their ability to attend a critical decision-making moment for the body they had joined, because they saw their role as mere executors of Prasad's scheme. Despite knowing the circumstances, they approved the Transaction and explained that the goal was to eliminate "dead equity" and "clean[] up the cap table."[290] Neither of them was concerned by the terms of the Transaction, as long as there was an indemnification provision in the certificate of incorporation. They did not even pretend to act as functioning directors, as evidenced by their total absence of questions or discussion during the Special Meeting.

Defendants' "dead equity" litigation theory does not save Kumar and Licona. Defendants have argued that Prasad believed that Ramadurgam was no longer contributing meaningfully to Destiny and that his continued ownership created governance and incentive problems. At most, that theory explains Prasad's motive, but there is no persuasive evidence that either Kumar or Licona inquired. Rather, it is undisputed that neither of them sought to ask Ramadurgam about Prasad's story.

None of the Individual Defendants made any effort to discharge their fiduciary responsibilities in the case of a conflicted controller transaction. Accordingly, the

---

[290] Tr. 331:17–19 (Kumar); *id.* at 266:19–22 (Licona); *see also id.* at 358:3–8, 418:17–20 (Kumar).

74

court finds that the Transaction was not entirely fair to Ramadurgam, and that the Individual Defendants breached their duty of loyalty.

### 2. The Restitutionary Remedy

"In an entire fairness case, the matter only proceeds to the remedial phase if the transaction fails the test of fairness." *Reis*, 28 A.3d at 466. The Transaction failed that test. The court's remedial authority is broad. The Court of Chancery "has broad power to fashion an equitable remedy." *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1391 (Del. 1995). "[I]n a breach of the duty of loyalty context . . . , the Court of Chancery's powers [are] as 'complete to fashion any form of equitable and monetary relief as may be appropriate.'" *In re Tesla, Inc. Deriv. Litig.*, 351 A.3d 1005 (Del. 2025) (ORDER) (quoting *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160 (Del. 2002)). That power permits the court to tailor relief to the wrong, so long as the remedy rests on an evidentiary basis. *See In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 407 (Del. 2024).

The remedy also must reflect the nature of the breach. "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). "An appropriate remedy must take into account the requirement 'that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such

75

conduct.'" *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. 2022) (quoting *Thorpe*, 676 A.2d at 445).

Here, those principles guide the court toward a restitutionary remedy. "Broadly speaking, restitution means restoration." 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.01[b] (2d ed. 2025). "All restitutionary remedies operate to restore to one party the benefit unjustly conferred upon another in a transaction." *Id.* Restitution differs from ordinary compensatory damages because it focuses on the defendant's gain rather than the plaintiff's loss. "Restitution measures the remedy by the defendant's gain and compels the defendant to disgorge that gain, while damage awards typically are designed to compensate the plaintiff for loss and are measured by the amount of that loss." *Id.*

Restitution can take different forms. It may be "in specie," meaning restoration of specific property, or it may be "substitutionary," meaning restoration of money as a substitute for the benefit received. *Id.* Where "the right to be enforced is one cognizable only in equity (e.g., fiduciary duty), the Court of Chancery may grant restitutionary relief—whether substitutionary or in specie—to rectify any unjust enrichment resulting from violation of the right." *Id.*

This case calls for restitution in specie.[291] The wrong was not only that Ramadurgam did not receive a fair price for his shares. The wrong was that Prasad used the Transaction to obtain and retain an ownership benefit that, in equity, he should not keep. That benefit is specific and identifiable: the equity interest, or its substitute form, that Ramadurgam would have retained absent the Transaction.

### a. Rescission is not the proper restitutionary remedy.

Plaintiff asks the court to return Ramadurgam and Prasad to their pre-Transaction equity ratios by requiring Prasad to transfer to Ramadurgam a portion of his membership interest in Destiny from his own holdings.[292] Plaintiff argues that Prasad holds enough equity to return Ramadurgam's interest without disturbing third-party interests.[293] Defendants argue that rescission is unavailable because the

---

[291] The historical phrase *restitutio in integrum* captures the same restorative impulse. One court, tracing the term's etymology, explained that "Restitutio" means "a restoring." *People v. Good*, 282 N.W. 920, 24 (Mich. 1938). In Roman law, *restitutio in integrum* referred to an extraordinary equitable intervention, granted *causa cognita*, by which a magistrate could set aside the legal effect of an act that operated inequitably and restore the prior juridical state as nearly as possible. *See generally* Giuliano Cervenca, *Studi vari sulla «restitutio in integrum»* (1965) (It.).

[292] Pl.'s Opening Br. 48–51; Pl.'s Answering Br. 31–34.

[293] Pl.'s Opening Br. at 50.

Transaction has been followed by later equity grants, option exercises, and other changes to Destiny's capitalization.[294]

The court agrees that rescission is not a viable remedy here. Rescission "refers to the avoidance of a transaction or the cancellation of the deal." 2 Wolfe & Pittenger, *Corporate and Commercial Practice* § 16.01[b]. It cancels or unwinds the challenged transaction and "requires that all parties to the transaction be restored to the *status quo ante*, *i.e.*, to the position they occupied before the challenged transaction." *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000). Rescission is a poor fit here because the present transaction is "too involved to undo." *Weinberger*, 457 A.2d at 714. The Delaware Supreme Court's recent *Tesla* decision reinforces the view that rescission is improper when the court cannot restore the parties to the *status quo ante*. *See Tesla*, 351 A.3d at 1005.

By contrast, "restitution itself involves the return of what one or both parties gained through an avoided transaction to prevent unjust enrichment." 2 Wolfe & Pittenger, *Corporate and Commercial Practice* § 16.04. Rescission and restitution often appear together because unwinding a transaction may require each side to return what it received. But they are not the same remedy. Rescission avoids the transaction, whereas restitution restores the benefit. That distinction controls here.

---

[294] Defs.' Opening Br. 45–47; Defs.' Answering Br. 24–27.

Plaintiff's requested remedy does not require the court to invalidate every aspect of the Transaction. It requires the court to identify the benefit Prasad obtained through the Transaction and determine whether equity permits him to retain it.

### b. A constructive trust is the proper restitutionary remedy.

A constructive trust supplies the appropriate form of restitution in specie. "A constructive trust is simply a form of restitution in specie." *B.A.S.S. Gp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (citation modified). It is "an equitable remedy of great flexibility and generality." *McMahon v. New Castle Assocs.*, 532 A.2d 601, 608 (Del. Ch. 1987). "The principle is that where a person holds property in circumstances in which, in equity and good conscience, it should be held or enjoyed by another, he will be compelled to hold the property in trust for that other." *Cannon v. Sisneros*, 1987 WL 16286, at *2 (Del. Ch. Aug. 31, 1987) (citing Harold Greville Hanbury & Ronald Harling Maudsley, *Hanbury and Maudsley Modern Equity* 301 (Jill E. Martin ed., 12th ed. 1985)). Thus, the doctrine is suited to a case in which the court need not unwind the Transaction in full, but must prevent Prasad from retaining ownership benefits obtained through fiduciary misconduct. The Delaware Supreme Court precedent states the same principle: "The doctrine of constructive trust effectuates the principle of equity that one who would be unjustly enriched, if permitted to retain property, is under an equitable duty to convey it to the rightful owner." *Hogg v.*

79

*Walker*, 622 A.2d 648, 652 (Del. 1993). A constructive trust "is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982). The doctrine is particularly apt where fiduciary misconduct produces ownership of specific property. In *Adams*, the Court quoted Pomeroy's formulation that constructive trusts reach "acts or omissions in violation of fiduciary obligations." *Id.* at 152 n.4 (citing 1 John Norton Pomeroy, *Pomeroy's Equity Jurisprudence and Equitable Remedies* § 166, at 210–11 (5th ed. 1941)). Under that formulation,

> [i]f one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it.

*Id.* (citing 1 Pomeroy, *Pomeroy's Equity Jurisprudence and Equitable Remedies* § 166, at 210–11). That is the situation here.

Prasad used the Transaction to obtain and retain beneficial ownership of the equity interest that Ramadurgam would have held absent Defendants' fiduciary breaches. Neither the process nor the price of the Transaction met the entire fairness standard. Prasad breached his duty of loyalty as a controller and director. Kumar and Licona approved the Transaction in bad faith. The result was that Prasad emerged holding the ownership benefit generated by the Transaction. Equity will

80

not permit Prasad to retain that benefit. The property at issue is identifiable. Plaintiff's requested share-transfer remedy identifies the ownership interest that would restore the pre-Transaction relative equity position using Prasad's own holdings. Plaintiff calculated that the remedy was 675,182 Class A shares, 3,375,912 Class B shares, and 3,375,912 Class C shares.[295] Defendants dispute rescission and argue that later events changed Destiny's capitalization, but their argument does not defeat a proprietary restitutionary remedy directed at the benefit that Prasad personally retained. In fact, Defendants explicitly state that Destiny's conversion to a limited liability company "does not affect the [c]ourt's ability to grant any of the relief sought by Ramadurgam," including "award[ing] the appropriate number and class of units in the limited liability company instead of shares."[296]

A constructive trust in this case avoids the overbreadth of rescission and the inadequacy of money damages. It does not cancel the Transaction and does not disturb later equity grants to others. Instead, it imposes a targeted, equitable remedy that requires Prasad to restore Ramadurgam to the relative equity position he was

---

[295] Pl.'s Opening Br. 50–51.

[296] Defs.' Answering Br. 38; *see also* Post-Trial Arg. at 74:24–75:2 (Defendants stating that, if the court decided for a restitutionary remedy, the sole difference related to the conversion to a limited liability company "would be [between] units and shares," and that the conversion was "not meant . . . to trick the court in some way" as the court "ha[s] the full power to do all the remedies").

deprived of because Defendants breached their fiduciary duties. As *McMahon* recognized, when "the defendant still has the property" and "the property has increased in its value while the defendant held it," the plaintiff may "rely upon the proprietary remedy of a constructive trust." 532 A.2d at 608.

Therefore, the court imposes a constructive trust on Prasad's ownership interests that are traceable to the equity that Ramadurgam would have retained absent the Transaction. Because Destiny has since converted from a corporation to a limited liability company, the trust will attach not to shares but to any substitute membership interests, thereby restoring Ramadurgam's ownership to 36.5% of Destiny's equity.

## B. The Claim Under Section 155 of the DGCL

Plaintiff's third cause of action is brought under Section 155 of the DGCL. As this court articulated in *Reis*, "a stockholder who seeks to challenge the board's decision [to pay cash in lieu of fractional shares] must plead and subsequently prove that the board acted wrongfully. A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties." 28 A.3d at 456–57. Having determined that the Transaction failed entire fairness review and having awarded equitable relief for the same fiduciary wrong,

the third cause of action under Section 155 of the DGCL does not require separate relief.

## C. Attorneys' Fees

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022) (quoting *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010)). But "it is also well established that [the Court of Chancery], 'under [its] equitable powers, has latitude to shift attorneys' fees.'" *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686 (Del. 2013) (citing *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1222 (Del. 2012)).

Under the bad faith exception to the American Rule, the court may shift fees "where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages." *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998); *see also Hardy v. Hardy*, 2014 WL 3736331, at *17 (Del. Ch. July 29, 2014) ("[A]n exception to the American Rule exists where the party against whom attorneys' fees are sought to be assessed acted in bad faith . . . in the conduct that gave rise to the litigation."); *Black v. Staffieri*, 2014 WL 814122, at *3 (Del. Feb. 27, 2014) (indicating that the court may shift fees "when a party's

83

prelitigation conduct is so egregious that it warrants fees as a form of damages.").

Of course, "not every case of intentional fiduciary wrongdoing justifies fee-shifting." *Hardy*, 2014 WL 3736331, at *17 (citation modified). "[A]n award of attorneys' fees is 'unusual relief.'" *Arbitrium*, 705 A.2d at 230 (citing *Weinberger*, 517 A.2d at 656). Rather, "this quite narrow exception is applied in only the most egregious instances of fraud or overreaching." *Id.*

"To award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in *subjective* bad faith. A finding of bad faith involves a higher or more stringent standard of proof, *i.e.*, 'clear evidence.'" *Id.* at 231–32. "Some actions may objectively be so egregiously unreasonable, however, that they seem essentially inexplicable on any ground other than [subjective] bad faith." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 107 (Del. 2013) (citation modified).

### 1. Defendants' pre-litigation conduct was glaringly egregious and the product of unusually deplorable behavior.

This case does not involve an ordinary fiduciary breach. Prasad initiated the Transaction after Ramadurgam demanded governance protections in exchange for Prasad's proposed equity grant. Importantly, the contemporaneous evidence demonstrates that Ramadurgam was open to considering Prasad's request to increase his equity stake, but he demanded one of the common monitoring devices for policing conflicts involving controlling stockholders—the appointment of

84

independent directors.[297] The disproportionate counterreaction that followed Ramadurgam's demands was animated by Prasad's deliberate abuse of control to remove Ramadurgam from the Company's capital structure and seize his co-founder's equity. *See, e.g.*, *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) (describing self-dealing as a situation where the controller receives a benefit "to the exclusion of, and detriment to, the minority stockholders.").

This case is strikingly similar to *In re Nine Systems Corporation Shareholders Litigation*, where this court equitably shifted fees after finding that defendants "utterly failed to understand their fiduciary relationship . . . , knowingly excluded from the decision-making process a director who represented a group of minority shareholders, effected the recapitalization through a grossly inadequate process, and sought to avoid full and fair communications with the [c]ompany's stockholders." 2015 WL 2265669, at *2 (Del. Ch. May 7, 2015) (citation modified). Prasad likewise engineered a controller cash-out to remove Ramadurgam from the cap table, concealed the plan from him until the moment of approval, and secured approval from directors he had just appointed (and only disclosed 30 minutes before the board meeting). Kumar and Licona intentionally disregarded their duties as Destiny's directors, made no inquiry into the terms of the Transaction or the resolutions

---

[297] Lucian A. Bebchuk & Assaf Hamdani, *Independent Directors and Controlling Shareholders*, 165 U. Pa. L. Rev. 1271, 1280 (2017).

submitted for their approval, and enabled Prasad's disloyal plan, which they simply rubber-stamped. When Ramadurgam sought to resolve the matter, Prasad dared Ramadurgam to sue him, citing the expense of litigation.[298]

These facts also support a finding beyond the elements of the underlying loyalty claims, as they demonstrate a purposeful use of corporate control to appropriate Ramadurgam's equity and a process deliberately structured to prevent the protections that might have constrained Prasad's conflict. The subjective element distinguishes this case from an ordinary intentional fiduciary breach.

Therefore, the court concludes that the pre-litigation conduct independently warrants fee-shifting as an element of equitable relief. Awarding fees is necessary to avoid leaving Ramadurgam to bear the cost of litigation required to remedy a deliberate breach of loyalty. *See William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011) (affirming entire fairness finding against conflicted managers of a limited liability company who manipulated a sale process and upholding fee-shifting as an equitable remedy for faithless pre-litigation conduct, even though the court-appointed appraisal yielded no damages award) ("Because the Court of Chancery

---

[298] JX 292 ("There is no possible claim that would provide you any continued equity position. Given that, candidly I'm not moved by any threat of litigation. It's incredibly unlikely that any claim you make would provide a greater monetary value than was already provided. In fact, not only would I/we successfully prevail, the cost of pursuing an extended, public litigation would certainly exceed any potential monetary objectives you may have.").

86

based its decision to award attorneys' fees and costs on the faithless conduct of the [individual defendants], the decision was neither arbitrary nor capricious. The Court of Chancery based its decision on conscience and reason by upholding Delaware law and discouraging disloyalty.").

The Delaware Supreme Court's recent decision in *Leo Investments Hong Kong Ltd. v. Tomales Bay Capital Anduril III, L.P.*, confirms that *Saliba* remains an unusual equitable fee-shifting case and does not authorize fees whenever a fiduciary breach is found. --- A.3d ----, 2026 WL 1993637, at *13–14 (Del. July 10, 2026). In *Leo Investments,* the Court reversed an award of nearly $16 million in fees that was due solely to a defendant's pre-litigation misrepresentation to the plaintiff, which resulted in nominal damages of $1.00. The Court distinguished that case from *Saliba*, where faithless fiduciaries orchestrated a self-interested sale process, failed to prove entire fairness, and left successful plaintiffs without a traditional damages award solely because a later appraisal showed the property at issue was valued at a lower amount than the sale price.

The factual findings here are closer to those found in *Saliba*. Ramadurgam prevailed on his claims. The Individual Defendants failed to prove entire fairness. The Transaction eliminated Ramadurgam's equity through a controller-designed cash-out. And the court has found that the Individual Defendants engaged in glaringly egregious conduct, which was the product of "unusually deplorable

87

behavior." *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at \*19 (Del. Ch. June 23, 2021); *see id.* (explaining that "not every proven breach of the duty of loyalty will justify an award of attorneys' fees as damages."); *see also Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at \*4 (Del. Ch. May 11, 2001) ("fees may be awarded against a defendant where 'the action giving rise to the suit involve[s] bad faith, fraud, conduct that was totally unjustified, or the like' and attorney's fees are considered an appropriate part of damages.'") (quoting *Barrows v. Bowen*, 1994 WL 514868, at \*2 (Del. Ch. Sept. 7, 1994)); *Barrows*, 1994 WL 514868, at \*2 ("I cannot conclude that defendants were engaged in a deliberate scheme to defraud or to overreach.").

Therefore, fee-shifting here would allocate the costs of successful litigation to fiduciaries whose faithless pre-litigation conduct made the litigation necessary. *See Leo Invs.*, --- A.3d ----, 2026 WL 1993637, at \*13–14.

Because the court concludes that fee-shifting is warranted based upon the individual defendants' egregious pre-litigation conduct, the court need not reach the issue of whether fee-shifting is warranted based upon bad-faith litigation conduct.

### 2. Defendants' unclean hands argument fails.

Defendants argue that Ramadurgam's request for fees is barred by unclean hands. They point to Ramadurgam's communications following the filing of the Complaint, including sharing the Complaint with others and, later, text messages

88

containing a screenshot of the court's remarks reflected in the post-trial transcript.[299]

Defendants characterize those communications as injurious.

"The equitable doctrine of unclean hands bars litigants who have acted inequitably from seeking what might otherwise be available relief. This Court uses the doctrine to protect the integrity of itself and those who come before it." *Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *6 (Del. Ch. Mar. 22, 2004), *aff'd*, 888 A.2d 204 (Del. 2005). "The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands." S*mithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000). "Further, the question of unclean hands is factual." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015). "[T]he scope of the unclean hands doctrine is limited, since it only applies when a claimant's misconduct is directly related to the merits of the controversy between the parties." 27A Am. Jur. 2d Equity § 25, Westlaw (database updated May 2026).

In this case, Ramadurgam is alleged to have shared information about the present lawsuit with non-parties. As highlighted in this decision, most of the allegations in the Complaint proved true, and the trial surfaced the egregiousness of Defendants' conduct. Even if some of Ramadurgam's communications were ill-advised, they do not bear the necessary relationship to the fiduciary breaches and

---

[299] Defs.' Opening Br. 63.

litigation misconduct that support fee-shifting. Neither do they warrant denying equitable relief designed to remedy Defendants' disloyal conduct. Therefore, the court concludes that the doctrine of unclean hands is inapplicable here and does not preclude the substantive relief awarded to remedy the Defendants' fiduciary breaches or the court's decision to shift fees.

One qualification is necessary. Destiny paid the Transaction consideration to Ramadurgam and to Pacific Premier Trust FBO Samvit Ramadurgam IRA. Ramadurgam returned the funds sent to him personally, but the funds sent to his trust have been effectively held in escrow to date. To avoid any double recovery, the funds still retained shall be credited against the award of attorneys' fees and expenses.

## III. CONCLUSION

Judgment is entered in favor of Ramadurgam on Counts I and II. Individual Defendants breached their fiduciary duties and failed to prove that the Transaction was entirely fair. The court imposes a constructive trust over Prasad's ownership interests so as to restore Ramadurgam's 36.5% equity interest in Destiny to reflect the pre-Transaction status quo. The claim asserted under Section 155 of the DGCL does not require separate relief.

Ramadurgam is entitled to an award of his reasonable attorneys' fees and expenses to be paid by the Individual Defendants, subject to a credit for any Transaction consideration retained by Ramadurgam.

The parties shall confer and submit a form of final order implementing this decision within ten business days.